2015-1854

# United States Court of Appeals
# for the Federal Circuit

BAYER CROPSCIENCE AG and BAYER S.A.S.,

*Plaintiffs-Appellants,*

v.

DOW AGROSCIENCES LLC,

*Defendant-Appellee.*

*Appeal from the United States District Court for the District of Delaware in
No. 1:12-cv-00256-RMB-JS, Judge Renée Marie Bumb*

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS
## NONCONFIDENTIAL

Robert J. Koch
MILBANK, TWEED,
  HADLEY & MCCLOY LLP
1850 K Street, NW, Suite 1100
Washington, DC 20006
(202) 835-7500

Christopher J. Gaspar
MILBANK, TWEED,
  HADLEY & MCCLOY LLP
28 Liberty Street
New York, NY 10005
(212) 530-5000

Adam K. Mortara
BARTLIT BECK HERMAN
  PALENCHAR & SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
(312) 494-4400

Daniel C. Taylor
BARTLIT BECK HERMAN
  PALENCHAR & SCOTT LLP
1899 Wynkoop Street, 8th Floor
Denver, CO 80202
(303) 592-3100

*Counsel for Plaintiffs-Appellants
Bayer CropScience AG and Bayer S.A.S.*

NOVEMBER 20, 2015

## CERTIFICATE OF INTEREST

Counsel for the Plaintiffs-Appellants certifies the following:

1.    The full name of every party or amicus represented by me is:

Bayer CropScience AG and Bayer S.A.S.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Bayer CropScience AG – Bayer AG.

Bayer S.A.S. – Bayer AG, Bayer Pharma AG, Bayer CropScience AG, Bayer G.f.B., and Bayer Global Investment B.V.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

MILBANK, TWEED, HADLEY & MCCLOY LLP:  Robert J. Koch, Fredrick M. Zullow, Christopher J. Gaspar, Jay I. Alexander, Arie M. Michelsohn, Ronald Sigworth, Stephanie R. Amoroso, Edward J. Mayle

RICHARDS, LAYTON & FINGER, PA:  Frederick L. Cottrell, III, Anne Shea Gaza, Jeffrey L. Moyer, Travis S. Hunter

ARCHER & GREINER, P.C.:  Kerri E. Chewning, Jennifer L. Dering

BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP: Adam K. Mortara, Daniel C. Taylor

ROPES & GRAY LLP:  Bradford J. Badke, Sona De

November 20, 2015

/s/ Adam K. Mortara
Adam K. Mortara
Counsel for Plaintiffs-Appellants
Bayer CropScience AG and Bayer S.A.S.

# **Table of Contents**

CERTIFICATE OF INTEREST..............................................................................i

TABLE OF AUTHORITIES...............................................................................iv

STATEMENT OF RELATED CASES ...............................................................1

JURISDICTIONAL STATEMENT .....................................................................2

STATEMENT OF THE ISSUES.........................................................................3

INTRODUCTION ...............................................................................................4

STATEMENT OF THE CASE...........................................................................10

    A.    Procedural History...........................................................................11

    B.    Related Litigation ............................................................................18

SUMMARY OF THE ARGUMENT ..................................................................21

ARGUMENT .....................................................................................................22

I.    BAYER'S POSITION THAT DOW DID NOT HAVE A VALID
    SUBLICENSE TO ITS PATENTS WAS REASONABLE ..............................25

    A.    The Plain Text Of The License Agreements Supports Bayer..................25

    B.    The Economics And Structure Of The Deal Support Bayer...................30

    C.    Evidence In The Record Supports Bayer .....................................................33

II.    THE DISTRICT COURT ABUSED ITS DESCRETION BY
    CONCLUDING THAT THIS CASE IS "EXCEPTIONAL" .........................37

    A.    The Fact That Bayer Lost Does Not Make This Case Exceptional ........38

    B.    Bayer's Position Was Reasonable ...............................................................39

    C.    Bayer Did Not Engage In Litigation Misconduct Regarding The
    Ownership Of Enlist E3..................................................................................42

    D.    The District Court's Other Reasons For Finding This Case
    "Exceptional" Do Not Withstand Scrutiny.................................................46

CONCLUSION AND STATEMENT OF RELIEF SOUGHT....................................48

ADDENDUM.............................................................................................................50

PROOF OF SERVICE..............................................................................................52

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE
REQUIREMENTS.....................................................................................................53

**<u>Statement Regarding Confidential Material Omitted:</u>**

The material redacted from pages 6, 30 (in footnote 3), 32 (in the text), and 35 are terms and text of Stine Seed's 2004 license from Bayer. The material redacted from pages 8 and 11 are terms and text of the soybean joint venture agreement between MS Tech and Dow. The material redacted from page 30 are the dollar amounts paid by Stine Seed and MS Tech for the larger 2004 transaction with Bayer concerning soybeans and corn. The material redacted from footnote 4 on page 32 are terms of Exhibit 3.1.5 of the Bayer-MS Tech license and terms of Bayer's patent license with a third party. The material redacted from page 34 is a description of and text from a confidential email exchange concerning the drafting of the 2004 license agreements. The material redacted from page 42 is a block quote from Bayer's sealed summary judgment brief which contains references to confidential evidence in the record concerning rights to and ownership of Enlist E3. The material redacted from footnote 6 on page 44 is a reference to Dow's confidential internal documents. The material redacted from footnote 7 on page 44 is a quote from one of Dow's arbitration briefs.

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Ace Constructors, Inc. v. United States,*
499 F.3d 1357 (Fed. Cir. 2007) ........................................................25

*Adelberg Labs., Inc. v. Miles, Inc.,*
921 F.2d 1267 (Fed. Cir. 1990) .......................................................27

*Barnhart v. Thomas,*
540 U.S. 20 (2003) ...........................................................................26

*Bayer CropScience AG v. Dow AgroSciences LLC,*
580 F. App'x 909 (Fed. Cir. 2014) .............................................. 1, 37

*Bayer CropScience AG v. Dow AgroSciences LLC,*
No. 10-cv-1045 RMB/JS, 2012 WL 4498527 (D. Del. Sept. 27, 2012),
*aff'd,* 728 F.3d 1324 (Fed. Cir. 2013) .............................................19

*Bayer CropScience AG v. Dow AgroSciences LLC,*
No. 2:12CV47, 2012 WL 2878495 (E.D. Va. July 13, 2012) .......................................19

*Bell Intercontinental Corp. v. United States,*
381 F.2d 1004 (Ct. Cl. 1967) ...........................................................27

*Bianco v. Globus Med., Inc.,*
No. 2:12-CV-00147-WCB, 2014 WL 1904228 (E.D. Tex. May 12, 2014) .......... 23, 24

*Biax Corp. v. Nvidia Corp.,*
__ F. App'x __, Nos. 2013-1649, 2013-1653, 2013-1654,
2015 WL 755940 (Fed. Cir. Feb. 24, 2015) .............................................*passim*

*Biax Corp. v. Nvidia Corp.,*
498 F. App'x 998 (Fed. Cir. 2013) ...................................................39

*Energy East Corp. v. United States,*
645 F.3d 1358 (Fed. Cir. 2011) .......................................................26

*Fogerty v. Fantasy, Inc.,*
510 U.S. 517 (1994) .........................................................................22

*Gaymar Indus., Inc. v. Cincinnati Sub-Zero Prods., Inc.,*
790 F.3d 1369 (Fed. Cir. 2015) ................................ 10, 23, 24, 38

*Harris v. Emus Records Corp.*,
   734 F.2d 1329 (9th Cir. 1984) ................................................................27

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*,
   134 S. Ct. 1744 (2014) ..................................................... 22, 23, 40, 46

*Martin v. Franklin Capital Corp.*,
   546 U.S. 132 (2005) ................................................................................23

*New Hampshire v. Maine*,
   532 U.S. 742 (2001) ................................................................................45

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
   134 S. Ct. 1749 (2014),
   *cert. granted*, 134 S. Ct. 49 (2013) .................................................*passim*

*Q-Pharma, Inc. v. Andrew Jergens Co.*,
   360 F.3d 1295 (Fed. Cir. 2004) ..............................................................23

*Rates Tech., Inc. v. Mediatrix Telecom, Inc.*,
   688 F.3d 742 (Fed. Cir. 2012) ......................................................... 17, 39

*SFA Sys., LLC v. Newegg Inc.*,
   793 F.3d 1344 (Fed. Cir. 2015) ..............................................................38

*Smith Int'l, Inc. v. Hughes Tool Co.*,
   718 F.2d 1573 (Fed. Cir. 1983) ..............................................................48

*Sparks v. Eastman Kodak Co.*,
   230 F.3d 1344 (Fed. Cir. 2000) ..............................................................39

*TecSec, Inc. v. Int'l Bus. Machs. Corp.*,
   731 F.3d 1336 (Fed. Cir. 2013) ..............................................................39

*United States v. Line Material Co.*,
   333 U.S. 287 (1948) ................................................................................26

## Statutes

28 U.S.C. § 1295 .........................................................................................2

28 U.S.C. § 1338 .........................................................................................2

28 U.S.C. § 1400 .........................................................................................2

35 U.S.C. § 285 ............................................................................................ *passim*

**Rules**

Fed. Cir. R. 36 ................................................................. 1, 17, 38, 39

Fed. R. App. P. 4 .................................................................................. 2

Fed. R. App. P. 26 ............................................................................... 2

Fed. R. App. P. 38 .............................................................................. 39

Fed. R. Civ. P. 11 ......................................................................... 23, 24

Fed. R. Civ. P. 12 ............................................................................... 12

Fed. R. Civ. P. 16 ............................................................................... 13

Fed. R. Civ. P. 56 ............................................................................... 35

Fed. R. Evid. 201 ............................................................................... 19

**Other Authorities**

MELVILLE B. NIMMER & DAVID NIMMER,
     NIMMER ON COPYRIGHT § 10.01[c][4] (1983) ................................ 27

THE SHORTER OXFORD ENGLISH DICTIONARY (5th ed. 2002) .............. 27, 28

## STATEMENT OF RELATED CASES

An earlier appeal from the same civil action was before this Court in No. 2014-1032, *Bayer CropScience AG v. Dow AgroSciences LLC.* The panel (Judges Newman, Plager, and Hughes) affirmed the district court without opinion under Federal Circuit Rule 36 on October 17, 2014. That decision is reported at 580 F. App'x 909 (Fed. Cir. 2014) (mem.) (per curiam).

Counsel is not aware of other pending cases that will directly affect or be directly affected by this Court's decision in the pending appeal.

# **JURISDICTIONAL STATEMENT**

Plaintiffs-Appellants Bayer CropScience AG and Bayer S.A.S. (collectively, "Bayer") appeal the United States District Court for the District of Delaware's award of attorney fees under 35 U.S.C. § 285. The district court had jurisdiction under 28 U.S.C. §§ 1338(a) and 1400(b) because this case arises under the patent laws of the United States. This Court has appellate jurisdiction under 28 U.S.C. § 1295(a)(1). The district court entered its order awarding $5,902,590.09 in attorney fees on June 18, 2015. A36. Bayer filed a timely notice of appeal on July 20, 2015. A19765; *see* Fed. R. App. P. 4 (a)(1)(A), 26 (a)(1)(C).

## <u>STATEMENT OF THE ISSUES</u>

Whether the district court abused its discretion by awarding Defendant Dow

AgroSciences LLC nearly $6 million in attorney fees under 35 U.S.C. § 285.

## **INTRODUCTION**

This is an appeal from the district court's determination that this case was "exceptional" and that Plaintiffs Bayer CropScience AG and Bayer S.A.S. (collectively, "Bayer") should pay nearly $6 million in attorney fees to Defendant Dow AgroSciences LLC ("Dow") under 35 U.S.C. § 285. The district court based its fee award on its view that Bayer's legal position was not only incorrect, but clearly and obviously wrong. The district court abused its discretion in reaching this conclusion. To show why, Bayer necessarily must provide this Court with a substantial discussion of Bayer's position on the merits. Bayer does not undertake this effort in order to re-litigate the case. Bayer recognizes and accepts that it lost. But to understand why the district court's fee award cannot stand, it is necessary to explain why Bayer had (and continues to have) a reasonable good-faith belief in the correctness of its position. This case is not "exceptional" because it does not "stand[ ] out from others with respect to the substantive strength of [Bayer's] litigating position" and Bayer did not litigate the case in an "unreasonable manner." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014).

This appeal arises from a patent infringement lawsuit involving genetically engineered soybeans. Dow is the developer of the Enlist E3 soybean ("Enlist E3"). Enlist E3 contains three separate chimeric genes that make it tolerant of three different commonly used herbicides. This case is about one of those genes, *dmmg*. The *dmmg* gene confers tolerance to glyphosate, a widely used herbicide marketed and

sold under the trade name Roundup®.  Bayer developed the *dmmg* gene and owns

seven patents covering technology enabling use of *dmmg* in plants.

Shortly after Dow publicly announced the development of Enlist E3 including

the *dmmg* gene, Bayer sued Dow for patent infringement.  A207.  Dow's defense to

the infringement lawsuit was that it had a license to commercialize the gene under

Bayer's patents.  Dow did not receive any such license directly from Bayer.  Rather,

Dow asserted it had obtained a sublicense from a third party, MS Technologies LLC

("MS Tech"), which itself had a license from Bayer.

The problem for Bayer was that it read the relevant license for MS Tech to

include only a gene-research license and not commercialization rights.  MS Tech

obtained that research license to Bayer's patents as part of a three-way transaction in

2004 between Bayer, MS Tech, and Stine Seed Farm, Inc. ("Stine Seed").  Stine Seed

is a large seed distributor, and MS Tech is a spinoff of Stine Seed (the "S" in MS Tech

stands for Stine, A7287 at 115:2-8).  In that transaction, Bayer made the business

decision to sell physical soybean research material, namely eight genetic "events"

containing the *dmmg* gene, and to convey patent rights necessary for the exploitation

of these events.  For reasons of their own, MS Tech and Stine Seed requested that

Bayer split up the rights into a non-sublicensable commercialization license (for Stine

Seed) and a sublicensable research license (for MS Tech).

*Confidential material subject to protective order was redacted from this page*

Stine Seed's commercialization license gave the company rights to produce and sell soybean seeds containing the *dmmg* gene. Article 2.1.1 of Stine Seed's license agreement provides:

> The LICENSOR hereby grants to the LICENSEE a ██████████ ████████ non-exclusive license – *without the right to grant sublicenses* – under the LICENSED PATENTS …, solely to increase, market, distribute for sale, sell and offer for sale SOYBEAN seeds containing the BAYER SOYBEAN EVENTS and/or the M.S. SOYBEAN EVENTS under brands owned by the LICENSEE and/or its AFFILIATES.

A373 (emphasis added). This provision includes an important limitation on the scope of Stine Seed's license: Stine Seed could not sublicense its commercialization rights. Stine Seed could only commercialize Bayer's patented technology directly under its own brands or through its affiliates, including MS Tech. Bayer did not grant Stine Seed the ability to dilute the value of Bayer's patents down to zero by granting the company an unfettered right to issue commercialization sublicenses to other players in the market, including Bayer competitors.

On the same day, Bayer also executed the research license with MS Tech. The operative section of MS Tech's research license is Article 3.1.2, which provides:

> The SELLER hereby grants to the PURCHASER solely with regard to SOYBEAN a worldwide, fully paid-up, exclusive license – with the right to grant sublicenses solely as set out in Article 3.1.3 *and with* the exception of the rights to increase, market, distribute for sale, sell and offer for sale, granted to STINE by separate agreement – under the LICENSED PATENTS in the field of GLYPHOSATE TOLERANT SOYBEAN solely to EXPLOIT GLYPHOSATE TOLERANCE GENES in M.S. SOYBEAN EVENTS.

A339 (emphasis and color added). Incorporating the relevant defined terms, this provision gave MS Tech an "exclusive license" under Bayer's patents to "exploit glyphosate tolerance genes" (genes "designed to confer glyphosate tolerance in SOYBEAN and comprising DMMG") in "M.S. soybean events" (genetically transformed Soybean events "made by or for" MS Tech). *Id.*, A335, A337.

Bayer read MS Tech's license as qualified in two respects based on its plain language—the two conditions set out between the hyphens in Article 3.1.2. First, MS Tech could grant sublicenses, but only in accordance with Article 3.1.3 (which prohibits granting "bare sublicenses," among other conditions). A339. Second, MS Tech's license did *not* include "the rights to increase, market, distribute for sale, sell and offer for sale" that were "granted to STINE by separate agreement." *Id.* These commercialization rights were identified as an "exception" to the scope of MS Tech's license. *Id.* The sixth recital at the beginning of the Bayer-MS Tech research license confirms this arrangement, noting that "some rights regarding the ASSET will be granted to STINE and will hence be *carved out* from this AGREEMENT." A334 (emphasis added).

As one would expect, Stine Seed paid significantly more money for its commercialization license than MS Tech paid for its research license. Stine Seed paid Bayer $4.6 million, A374 at Art. 3.1, whereas MS Tech paid Bayer only $1 million, A343 at Art. 4.1.

*Confidential material subject to protective order was redacted from this page*

████████ later, MS Tech and Dow entered into a joint venture for the development of genetically modified soybeans. Enlist E3 was the product of that joint venture. As part of the arrangement between the two companies, MS Tech purported to grant Dow ██████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████ This is the authority under which Dow purported to have a sublicense to commercialize Enlist E3 under Bayer's patents. But as shown above, Bayer reasonably concluded Dow could not have received a valid commercialization sublicense from MS Tech because MS Tech did not have commercialization rights in the first place.

In order to confirm its understanding of the Bayer-MS Tech license agreement under English law, which governs the agreement, Bayer also sought the opinion of one of the world's foremost experts on English contract law. A350 at Art. 12. Bayer provided the relevant agreements to Lord Lawrence Collins of Mapesbury, a recently retired Justice of the Supreme Court of the United Kingdom. A5978-79. Lord Collins agreed with Bayer's interpretation of the plain language of the agreement, finding MS Tech's license to be "clear on its face" that it "plainly excepts the rights to increase, market, distribute for sale, sell and offer for sale, granted to Stine Seed by separate agreement." A7964 at ¶ 65

Notwithstanding (1) the plain text of the Bayer-MS Tech research license, including the recital that certain rights were "carved out" and granted to Stine Seed; (2) the difference in the prices that MS Tech and Stine Seed paid for their respective bundles of rights; and (3) record evidence supporting Bayer's interpretation of the MS Tech research license, including a declaration and testimony from Lord Collins that Bayer's interpretation was correct under governing English law, the district court saw things differently. Even though a different judge (Judge Richard G. Andrews) who had initially presided over the case rejected Dow's licensing defense at the motion-to-dismiss stage, A735, the district court (Judge Renée Marie Bumb) granted Dow's motion for summary judgment, A8956. The district court held that (1) MS Tech obtained fully sublicensable commercialization rights in its 2004 license agreement with Bayer, and (2) MS Tech validly sublicensed those rights to Dow for purposes of developing and selling Enlist E3 soybeans. A8965.

But the district court did not just rule against Bayer on the merits. It went further and awarded Dow attorney fees under 35 U.S.C. § 285. Applicable to patent disputes, § 285 provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." The district court believed that Bayer's position on Dow's license defense was so devoid of merit as to make the case "exceptional" and justify forcing Bayer to pay Dow nearly $6 million in attorney fees. A4-5, A36-37.

The district court abused its discretion by ordering Bayer to pay Dow's attorney fees under § 285. In order to be "exceptional," a case must "stand[ ] out from others

with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness*, 134 S. Ct. at 1756. True, Bayer's position did not ultimately prevail. But "fee awards are not to be used 'as a penalty for failure to win a patent infringement suit.'" *Gaymar Indus., Inc. v. Cincinnati Sub-Zero Prods., Inc.*, 790 F.3d 1369, 1373 (Fed. Cir. 2015) (quoting *Octane Fitness*, 134 S. Ct. at 1753). Bayer's position that Dow did not have a valid sublicense to commercialize Enlist E3 was a reasonable one, supported by the plain text of the license agreements, the economics and structure of the deal with MS Tech and Stine Seed, and evidence in the record. Bayer should not face a $6 million penalty for having litigated its reasonable position in good faith.

## STATEMENT OF THE CASE

Bayer is a leading developer of herbicide-tolerance technology for crops. In general, this field involves altering the genetic makeup of crop seeds to make the resulting plants tolerant of herbicides. This technology allows farmers to spray their entire fields with herbicides, killing weeds and other unwanted plants while leaving the crops undamaged.

In 2004, Bayer decided to sell and license some of its interests in herbicide-tolerant soybeans ("Soybean Events") to the Stine Seed family of companies. Specifically, Bayer sold its interests in eight of its soybean events containing the *dmmg* gene, which confers tolerance to the herbicide glyphosate (Roundup®). For reasons

10

*Confidential material subject to protective order was redacted from this page*

of its own, Stine Seed asked that Bayer split up rights between two related companies, MS Tech and Stine Seed. A5775-76, A5789. Bayer did just that in two separate license agreements both executed on the same day, May 28, 2004. A331, A367. The relevant provisions of MS Tech's sublicensable research license and Stine Seed's non-sublicensable commercialization license are set forth in the Introduction above. Both license agreements are governed by English law. A350 at Art. 12, A380 at Art. 10.

███████ after it obtained its research license from Bayer, MS Tech entered into a joint venture with Dow to develop herbicide-tolerant soybean seeds. A254. In August 2011, Dow announced that it had submitted for regulatory approval a "three-gene herbicide-tolerant soybean," which Dow markets under the name "Enlist E3." A251. The Enlist E3 soybean is tolerant of three different herbicides—glufosinate, 2,4-Dichlorophenoxyacetic acid (known more simply as "2,4-D"), and glyphosate. *Id.* Enlist E3's glyphosate tolerance comes by virtue of the incorporation of the *dmmg* gene, which Dow obtained from MS Tech. A231-32.

### A.    Procedural History

Shortly after learning of Dow's intention to market and sell Enlist E3, Bayer filed a lawsuit in the United States District Court for the District of Delaware accusing

Dow of infringing Bayer's patents covering the *dmmg* gene.[1]  A207.  The case was originally assigned to Judge Richard G. Andrews.

Dow's first move was to file a motion to dismiss.  A223.  Dow argued that it had obtained a sublicense from MS Tech to develop and commercialize the *dmmg* gene in Enlist E3 under Bayer's patents.  A230.  Dow therefore urged dismissal on two grounds: (1) failure to join MS Tech as an indispensable party, A234-43, and (2) Dow had a sublicense to commercialize the accused product, A243-46.

Bayer responded that Dow could not have a sublicense from MS Tech to commercialize Enlist E3 under Bayer's patents because the 2004 agreements did not grant MS Tech (or anyone) sublicensable commercialization rights.  A433-36.  Rather, the 2004 agreement only granted MS Tech the right to conduct (and sublicense) research and development activities on the genes themselves.  *Id.*  Bayer did grant a license to commercialize and sell seeds to Stine Seed.  Importantly, the Stine Seed commercialization license was not sublicensable.  *Id.*

Judge Andrews rejected Dow's license defense and denied the motion to dismiss.  A735.  Judge Andrews held that Dow's licensing defense was "factual" and was therefore "misplaced within the context of a 12 (b)(6) motion."  A737.  Although Judge Andrews did not purport to give a "definitive interpretation" of the relevant licenses, A736 n.1, he offered as "background" an initial description of the

---

[1] Bayer originally sought to assert its infringement claims as an amendment to Bayer's complaint in an existing lawsuit between Bayer and Dow.  A2234.  Bayer ultimately withdrew its motion to amend and filed this separate action.

agreements under which Dow could not have received a commercialization sublicense

from MS Tech because MS Tech did not have commercialization rights itself:

> Bayer granted two licenses relevant to this litigation.  The first license was granted to Stine Seed Farm, Inc. ("the Bayer-Stine License").  The Bayer-Stine License allows Stine to commercialize soybean seeds containing the "Bayer Soybean Events."  This right is limited to brands owned by Stine or its affiliates and explicitly excludes the right to sublicense.  The second license was granted to an affiliate of Stine, MS Technologies, LLC ("the Bayer-MS Tech License").  The Bayer-MS Tech License grants MS Tech the right to "exploit" the soybean technology, although it may exclude the commercialization rights granted to Stine.  *This would allegedly allow MS Tech to conduct research and work with government regulators in relation to the soybean technology, but would not allow it to sell or market the technology.*  The Bayer-MS Tech License is also distinct from the Bayer-Stine license in that it allows some sub-licensing.

A736 (emphasis added) (internal citations and footnotes omitted).

Judge Andrews held a Rule 16 scheduling conference on January 4, 2013,

shortly after he denied Dow's motion to dismiss.  A756.  During the conference,

Judge Andrews remarked that "it was not obvious to me that whatever contracts I

saw, you know, made out a bulletproof licensing defense."  A759:20-24.  Judge

Andrews elaborated that the "daisy chain of contracts" was "complex" and included

"the world's leading densely-written contract."  A759:15-18, A765:11-14.

On April 10, 2013, the case was reassigned to Judge Renée Marie Bumb of the

United States District Court for the District of New Jersey.  A6-A7, A184.  Judge

Bumb had presided over a related patent lawsuit between Bayer and Dow concerning

one of the other three herbicide-tolerance genes in Enlist E3.  *Bayer CropScience AG v.

Dow AgroSciences LLC*, No. 1:10-cv-1045-RMB-JS (D. Del.).

13

Following a limited period of discovery, Dow moved for summary judgment of non-infringement based on its purported sublicense. A4426. Dow reiterated its position that Article 3.1.2 of the 2004 Bayer-MS Tech license gave MS Tech a fully sublicensable right to commercialize seeds under the Bayer patents, and that MS Tech had sublicensed that right to Dow for Enlist E3. A4447-61. Dow argued that the "exception clause" in the agreement ("with the exception of the rights to increase, market, distribute for sale, sell and offer for sale, granted to STINE by separate agreement," A339 at Art. 3.1.2) "was merely an exception to MS Tech's exclusivity," not an exception to the scope of MS Tech's license itself. A4450. Dow offered no explanation for how MS Tech paid approximately 20% of the license fee that Stine Seed did but still got, according to Dow, sublicensable commercialization rights while Stine Seed got non-sublicensable commercialization rights. Dow also offered no explanation for why Stine Seed was prohibited from sublicensing commercialization rights when its corporate sibling, which shared the same management, enjoyed an unfettered right to sublicense.

Dow's support for its interpretation relied on testimony from three fact witnesses who were closely affiliated with MS Tech and Stine Seed—Harry Stine (an officer of Stine Seed and a manager of MS Tech), Joseph Saluri (MS Tech's corporate counsel), and Edward Mansfield (MS Tech's former outside counsel). A4439-43. To no one's surprise given their affiliation with MS Tech (one of the two co-developers of Enlist E3), all three witnesses testified that MS Tech received full

14

commercialization rights and sublicensed those rights to Dow. *Id.* Dow also relied on the testimony of two Bayer employees who were involved with negotiating the deal with MS Tech and Stine Seed, David Morgan and Margaret Keating. Both witnesses gave testimony to the effect that Bayer did not particularly care how the rights were divided between the two companies. A4437-39, A4443-45. Neither witness supported Dow's interpretation of the plain language of the MS Tech license.

Bayer responded that the 2004 Bayer-MS Tech research license unambiguously prohibited MS Tech from sublicensing commercialization rights. The placement of the "exception" clause within Article 3.1.2, the "carve out" mentioned in the sixth recital, and the difference in prices that MS Tech and Stine Seed paid for their respective licenses made clear that Bayer had only granted (non-sublicensable) commercialization rights to Stine Seed. A7102-08. Bayer cited evidence in the record that supported Bayer's interpretation, including the recollection of witnesses who participated in negotiating the deal and drafting the license agreements and contemporaneous emails discussing the "split up" of rights between MS Tech and Stine Seed. A7113-14. Bayer also submitted a declaration from Lord Collins, a former Justice of the Supreme Court of the United Kingdom. Lord Collins rendered his professional judgment that under relevant principles of English law Bayer's interpretation of the MS Tech license was correct and Dow's interpretation was "impossible." A7965.

Bayer also made an alternative argument under Dow's reading of MS Tech's license. Assuming *arguendo* that MS Tech could sublicense commercialization rights, it could only sublicense those rights in connection with "M.S. SOYBEAN EVENTS," meaning soybean events "made by or for" MS Tech. A337, A339. Bayer argued that Enlist E3 was not an "M.S. soybean event" because Dow made Enlist E3 "for Dow," not "for MS Tech." A7121-22. Dow after all had contributed two of the three herbicide-tolerant genes in Enlist E3, while MS Tech had contributed only one (*dmmg*). *Id.* And because Enlist E3 was jointly owned by Dow and MS Tech, Dow could not have made the product "for" MS Tech because Dow owned it too. *Id.*

Notwithstanding all of the foregoing—the plain text of Article 3.1.2 in the MS Tech license, the carve-out preamble, the price differential, the opinion of a former justice of the U.K. Supreme Court on an issue of English law, and the (at best) conflicting record evidence—the district court granted Dow's motion for summary judgment on October 7, 2013. A8956, A8267. The district court agreed with Dow's interpretation of the 2004 Bayer-MS Tech license, reasoning that "[a]s a matter of syntax, the 'with the exception' language more naturally modifies the exclusivity of MS Tech's license than its right to exploit." A8975. The district court also concluded that Dow's interpretation was consistent with the "factual matrix" given that the split up of rights was done at MS Tech's and Stine Seed's request and Bayer witnesses testified that Bayer did not care how the rights were divided between the two companies. A8977-78. The district court further decided that the "carve out" preamble was "not

16

inconsistent with [the] Court's analysis" because it simply described "a 'carve out' of MS Tech's exclusivity." A8978.

The district court also concluded that MS Tech could appropriately grant Dow a sublicense for Enlist E3 because Enlist E3 was "made by or for" MS Tech and therefore qualified as an "M.S. SOYBEAN EVENT." The district court reasoned that MS Tech's ownership interest in Enlist E3 meant that Enlist E3 was made "for" MS Tech. A8979-83.

Bayer appealed the summary judgment ruling to this Court. This Court affirmed without opinion under Federal Circuit Rule 36—a result that "simply confirms that the trial court entered the correct judgment" but "does not endorse or reject any specific part of the trial court's reasoning." *Rates Tech., Inc. v. Mediatrix Telecom, Inc.*, 688 F.3d 742, 750 (Fed. Cir. 2012).

Two weeks after the district court's summary judgment ruling, Dow moved for attorney fees under 35 U.S.C. § 285. A8988. Because the Supreme Court had recently granted certiorari in *Octane Fitness* to decide the standard for awarding fees under § 285, 134 S. Ct. 49 (2013), the district court denied Dow's fee motion without prejudice and directed Dow to re-file after the Supreme Court handed down the *Octane Fitness* decision. A12635.

Dow re-filed its motion for attorney fees under § 285 on May 19, 2014. A12639. On March 13, 2015, the district court granted Dow's motion. A4-5. The district court thought that Bayer's reading of the MS Tech license agreement was

17

"contorted" and that "Bayer's conduct in litigating this case in the face of evidence that contradicted [that] reading … was objectively unreasonable." A26. The district court also accused Bayer of engaging in "litigation misconduct" by taking conflicting positions in this litigation and a related arbitration regarding MS Tech's ownership of Enlist E3. A23-24. The district court criticized Bayer for arguing in this litigation that "there was a dispute as to whether E3 was made by or for MS Tech" but then later, after the district court itself had found that "[t]here is no dispute that MS Tech owns E3," A8979-80, so informing the arbitration panel that it was "undisputed" "that MS Tech has always owned the Enlist E3 event." A23 (internal quotation marks omitted).

After receiving additional documentation of billing entries for Dow's attorneys, the district court awarded Dow $5,902,590.09 in fees. A36-37. It also invited Dow to seek additional fees for this appeal if Bayer is unsuccessful. *Id.*

### B.    Related Litigation

This case is one of three different pieces of litigation between Bayer and Dow regarding herbicide-tolerance technology in Enlist E3 soybeans. These three actions are known as *Bayer I*, *Bayer II*, and *Bayer III*. This action is *Bayer II*. The other two pieces of litigation concern the two other herbicide-tolerance genes in Enlist E3, *aad-12* and *pat*. Bayer provides a brief summary of these other fronts in the larger dispute between Dow and Bayer so that this Court may understand the larger context into which Bayer's positions and arguments in this case fit.

In the first action (*Bayer I*), Bayer sued Dow in federal court for patent infringement relating to the *aad*-12 gene in Enlist E3.  That gene confers resistance to the herbicide 2,4-D.  Judge Bumb also presided over that case.  After construing claim terms in Bayer's patents in Dow's favor, the district court granted summary judgment of noninfringement to Dow.  *Bayer CropScience AG v. Dow AgroSciences LLC*, No. 10-cv-1045 RMB/JS, 2012 WL 4498527 (D. Del. Sept. 27, 2012) (Bumb, J., sitting by designation).  This Court affirmed.  *Bayer CropScience AG v. Dow AgroSciences LLC*, 728 F.3d 1324 (Fed. Cir. 2013).

The other action (*Bayer III*) concerns the *pat* gene in Enlist E3, which confers resistance to the herbicide glufosinate.  Bayer sued Dow in the Eastern District of Virginia, alleging that Dow had breached the terms of a 1992 license agreement to Bayer's patents covering the *pat* gene.  The district court stayed that action pending arbitration.  *Bayer CropScience AG v. Dow AgroSciences LLC*, No. 2:12CV47, 2012 WL 2878495 (E.D. Va. July 13, 2012).  Bayer and Dow arbitrated the case before the International Court of Arbitration of the International Chamber of Commerce.  The arbitral panel issued a 338-page opinion ruling in Bayer's favor on October 9, 2015. [2]

---

[2] Because the arbitral panel issued its decision after Bayer filed its notice of appeal in this case and therefore the decision was not part of the record filed in the district court, Bayer has contemporaneously with this opening brief filed a motion requesting that this Court take judicial notice of the arbitration decision under  Federal Rule of Evidence 201.  For convenience, Bayer has assigned appendix page numbers to the arbitration decision, and Bayer cites those page numbers in this brief.

Ownership of Enlist E3 is of central importance to the arbitration, *Bayer III*.
That is because under Dow's 1992 license agreement with Bayer, Dow could not
"sublicense the underlying *pat* gene patent rights or act as a contractor to make *pat*-
containing Transformants owned by someone other than Dow." A19829 at ¶ 220.
Thus, *Bayer III* presented the inverse of the ownership issue in this action. In this
action, it was good for Dow if MS Tech owned Enlist E3 because it meant that, if MS
Tech had sublicensable commercialization rights, the product could be sublicensed as
an "M.S. Soybean Event" under the Bayer-MS Tech license. In the arbitration,
however, it was bad for Dow if MS Tech owned Enlist E3 because that meant that
"Dow effectively sublicensed the *pat* gene to MS Tech," in violation of Dow's 1992
license agreement. A19834 at ¶ 234.

Dow cast its stone on the ownership issue in this litigation, arguing that Enlist
E3 was made "for" MS Tech because MS Tech owned the product. A4460. The
district court agreed with Dow's argument. A8979-A8983. Having made its bed on
the ownership issue in *Bayer II*, Dow had to lay in it for *Bayer III*. The arbitral panel
adopted Judge Bumb's finding that Enlist E3 was made "for" MS Tech: "The parties
to this Arbitration, through an implied recognition of the effect of issue estoppel or
otherwise, take as their starting point the *Bayer II* finding that Enlist E3 is indeed an
MS Tech event, not a Dow event." A19858 at ¶ 310. The panel concluded that it
"must" "accept" "that E3 is indeed an MS Tech event." *Id.* Based on this, the panel
found that Dow was "in breach [of the licensing agreement] by virtue of its effective

20

sublicensing of the underlying *pat* gene itself, which ultimately went into

Transformants produced by MS Tech." A19841 at ¶ 255. The panel further found

that Bayer rightfully terminated the licensing agreement as a result of this breach

A19850-51 at ¶¶ 284-86, and that Enlist E3 infringed Bayer's patents on the *pat* gene

A19892-912 at ¶¶ 416-48. Bayer was awarded more than $455 million in damages,

royalties, and costs. A20104.

## SUMMARY OF THE ARGUMENT

The only thing "exceptional" about this case is that the district court deemed

Bayer's legal position to be so without merit as to warrant awarding Dow nearly $6

million in attorney fees under § 285. Bayer had an objectively reasonable basis for

arguing that Dow did not have a valid sublicense from MS Tech to commercialize

Bayer's patented technology. Bayer's position found support in (1) the plain language

of the Bayer-MS Tech license agreement; (2) the structure of the licensing deal,

including the different prices MS Tech and Stine Seed paid for their respective

bundles of rights; and (3) documents and testimony in the record, including a

declaration from a former Justice of the Supreme Court of the United Kingdom that

Bayer's position was correct and Dow's position was "impossible" under relevant

principles of English law. The district court ultimately disagreed with Bayer and sided

with Dow, but the question was one that Bayer was entitled to litigate in good faith.

The district court also accused Bayer of litigating the case unreasonably, but the

reasonableness of Bayer's litigation moves is inextricably tied up with the

reasonableness of Bayer's position on the merits. And, perhaps owing to its own strong views on the merits, the district court went so far as to erroneously accuse Bayer of litigation misconduct in connection with a rather ordinary application of estoppel against Dow in the arbitration. In these circumstances, the district court abused its discretion by awarding Dow nearly $6 million in attorney fees under § 285.

## ARGUMENT

A district court's power to award attorney fees under § 285 "is reserved for 'exceptional' cases." *Octane Fitness*, 134 S. Ct. at 1755-56. Under the Supreme Court's recently announced test, to be considered "exceptional" a case must "stand[ ] out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Id.* at 1756. District courts make this determination on a "case-by-case" basis "considering the totality of the circumstances." *Id.* Among the factors the district court may consider are "'frivolousness, motivation, [and] objective unreasonableness (both in the factual and legal components of the case).'" *Id.* at 1756 n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)). A party must prove its entitlement to fees by a preponderance of the evidence. *Id.* at 1758.

Because the award of attorney fees under § 285 is an exercise of discretion, this Court reviews a district court's decision granting or denying fees for abuse of discretion. *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1748 (2014).

Although the standard of review is deferential to the district court, that deference is limited in two important respects. First, the district court must exercise its discretion in accordance with the law and the facts. "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Id.* at 1748 n.2 (internal quotation marks omitted); *see also Martin v. Franklin Capital Corp.*, 546 U.S. 132, 139 (2005) ("[A] motion to a court's discretion is a motion, not to its inclination, but to its judgment; and its judgment is to be guided by sound legal principles." (internal quotation marks omitted)).

Second, the appellate review standard's deference to the district court is tempered by the high substantive standard the district court must apply in order to award fees under § 285. That standard is whether Bayer's position was so obviously incorrect that litigating it was "unreasonable." *See Biax Corp. v. Nvidia Corp.*, __ F. App'x __, Nos. 2013-1649, 2013-1653, 2013-1654, 2015 WL 755940, at *4 (Fed. Cir. Feb. 24, 2015); *see also Gaymar Indus.*, 790 F.3d at 1372-73 (whether party's litigating position is "objectively baseless" is relevant to the *Octane Fitness* test). Or as Circuit Judge Bryson has put it, the question is whether a party's position "is so plainly non-meritorious that no reasonable attorney could realistically expect success on the merits." *Bianco v. Globus Med., Inc.*, No. 2:12-CV-00147-WCB, 2014 WL 1904228, at *3 (E.D. Tex. May 12, 2014) (Bryson, J., sitting by designation); *cf. Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1299 (Fed. Cir. 2004) (standard for imposing Rule

23

11 sanctions is whether claim is "legally or factually baseless from an objective perspective" (internal quotation marks omitted)).

Judged by these standards, the district court abused its discretion by concluding that Bayer's position concerning Dow's sublicense defense was so plainly non-meritorious as to make the case "exceptional" under § 285. Bayer had a reasonable argument that MS Tech did not have sublicensable commercialization rights based on the text of the 2004 Bayer-MS Tech license, the economics and structure of the deal, and evidence in the record. Although the district court ultimately disagreed with Bayer's position, there was nothing "unreasonable[ ]," "frivolous[ ]," or "objectively baseless" about Bayer's arguments. *Octane Fitness*, 134 S. Ct. at 1754, 1756 n.6; *Gaymar Indus.*, 790 F.3d at 1372-73; *Biax Corp.*, __ F. App'x __, 2015 WL 755940, at *4. "In short, [Bayer's infringement] claim in this case is a fairly routine example of a claim that did not prevail; it is not the exceptional case of a claim that is so plainly non-meritorious that no reasonable attorney could realistically expect success on the merits." *Bianco*, 2014 WL 1904228, at *3 (Bryson, J.). Furthermore, the district court's finding that Bayer engaged in litigation misconduct in connection with its position on the ownership of Enlist E3 is just wrong.

## I.    BAYER'S POSITION THAT DOW DID NOT HAVE A VALID SUBLICENSE TO ITS PATENTS WAS REASONABLE

### A.    The Plain Text Of The License Agreements Supports Bayer

Dow's license defense boiled down to an issue of contract interpretation.  "In contract interpretation, the plain meaning of the contract's text controls unless it is apparent that some other meaning was intended and mutually understood." *Ace Constructors, Inc. v. United States*, 499 F.3d 1357, 1361 (Fed. Cir. 2007).  Both of the parties' experts on English law (which governs the license agreements) agreed that the text of a contract is the most important guide to ascertaining the contract's meaning. A5253 at ¶ 8 (Peel Declaration); A7947 at ¶ 26 (Collins Declaration).

Bayer's reading of the 2004 Bayer-MS Tech research license agreement—*i.e.*, that MS Tech did not receive commercialization rights because those rights were carved out and granted to Stine Seed—was certainly reasonable.  The relevant provision, Article 3.1.2, provides:

> The SELLER hereby grants to the PURCHASER solely with regard to SOYBEAN a worldwide, fully paid-up, exclusive license – with the right to grant sublicenses solely as set out in Article 3.1.3 *and with* the exception of the rights to increase, market, distribute for sale, sell and offer for sale, granted to STINE by separate agreement – under the LICENSED PATENTS in the field of GLYPHOSATE TOLERANT SOYBEAN solely to EXPLOIT GLYPHOSATE TOLERANCE GENES in M.S. SOYBEAN EVENTS.

A339 (emphasis and color added).

The question is whether the "exception" clause ("with the exception of the rights to increase, market, distribute for sale, sell and offer for sale, granted to STINE

25

by separate agreement") modifies the scope of MS Tech's license (Bayer's position) or merely modifies the exclusivity of MS Tech's license (Dow's position).  Both grammar and logic compel the conclusion that the "exception" clause modifies the scope of MS Tech's license.

First, it is an ordinary rule of grammar (called the "rule of the last antecedent") that "a limiting clause or phrase … should ordinarily be read as modifying only the noun or phrase that it immediately follows."  *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003); *see also Energy East Corp. v. United States*, 645 F.3d 1358, 1361 (Fed. Cir. 2011). The two limiting clauses between the hyphens, including the "exception" clause, immediately follow the word "license."  Therefore, the "exception" clause modifies MS Tech's "license," or even MS Tech's "exclusive license."  But it would take a feat of grammatical acrobatics to conclude that the "exception" clause modifies only the word "exclusive" but not the word "license."

Second, both of the conditions between the hyphens (the right to grant sublicenses and the exception of commercialization rights) must modify the same thing because they are joined together by the words "and with."  The right to grant sublicenses modifies the substantive scope of MS Tech's "license" because the right to grant sublicenses (and the conditions under which those sublicenses may be granted) is an element of a license grant that must be affirmatively specified.  *See United States v. Line Material Co.*, 333 U.S. 287, 353 (1948) (noting that "authority to issue [a] sublicense" is by "express grant … of a[ ] … right to issue it" (Vinson, C.J.,

26

Burton & Frankfurter, JJ., dissenting); *cf. Harris v. Emus Records Corp.*, 734 F.2d 1329, 1333 (9th Cir. 1984) ("A licensee … ha[s] no right to re-sell or sublicense the rights acquired unless he has been expressly authorized to do so." (quoting MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 10.01[c][4] (1983))). Indeed, the clause concerning the right to grant sublicenses cannot logically modify just the exclusivity of MS Tech's license because sublicensing has nothing to do with exclusivity. An exclusive license can include or not include the right to sublicense. *See Bell Intercontinental Corp. v. United States*, 381 F.2d 1004, 1016-17 (Ct. Cl. 1967) (per curiam). The same is true of a non-exclusive license. *See Adelberg Labs., Inc. v. Miles, Inc.*, 921 F.2d 1267, 1272 (Fed. Cir. 1990). Therefore, because the right to grant sublicenses must modify the substantive scope of MS Tech's "license" and not merely the exclusivity of that license, Bayer read the "exception" clause to modify the same thing.

The sixth recital at the beginning of the Bayer-MS Tech license confirms Bayer's reading of Article 3.1.2. That recital provides: "WHEREAS some rights regarding the ASSET will be granted to STINE and will hence be *carved out* from this AGREEMENT." A334 (emphasis added). THE SHORTER OXFORD ENGLISH DICTIONARY 351 (5th ed. 2002) defines to "carve out" as to "take from a larger whole … esp. a smaller estate from a larger one." Properly read, the sixth recital thus indicates that the commercialization rights—a piece of the license "estate" being

granted—were being "take[n] from [the] larger whole " of MS Tech's license and granted to Stine Seed. *Id.*

The district court ultimately disagreed. Casting aside Bayer's analysis and that of Lord Collins, the court concluded for itself that "[a]s a matter of syntax, the 'with the exception' language more naturally modifies the exclusivity of MS Tech's license than its right to exploit. If the parties had intended to qualify the right to 'exploit,' the 'with the exception of' language would have followed the word 'exploit.'" A8975.

The district court also announced that "it makes little sense to define 'exploit' broadly at the outset and use that term in Article 3.1.2, if the parties' intent for 3.1.2 was for MS Tech to have much more limited rights." *Id.* But "exploit" is a defined term that is used throughout the agreement. The agreement defines "exploit" as "to make, breed, produce, condition, market, offer, sell, import, export, stock, use, or otherwise dispose of (or offer to do or have done any or all of the foregoing)." A335. Article 2.1.1 of the agreement gives MS Tech "all rights to EXPLOIT the ASSET," meaning the physical Bayer genetic events that Bayer was selling to MS Tech. A338. The agreement uses "EXPLOIT" again in Article 3.1.2 but includes an explicit limitation, carving out commercialization rights. A339. There is nothing unusual about defining a generally applicable term at the beginning of an agreement and then noting specific limitations relevant to specific applications of the term. Indeed, the introduction of the definitions section (Article 1.1) notes that the definitions apply "[u]nless [the term is] otherwise defined herein." A334.

28

Furthermore, the district court's focus on the word "exploit" in Article 3.1.2

proves too much. Article 3.1.2 gives MS Tech a license "solely to EXPLOIT

GLYPHOSATE TOLERANCE *GENES* in M.S. SOYBEAN EVENTS." A339

(emphasis added). Many of the verbs contained in the broad general definition of

"exploit" make no sense in this context because they do not describe activities one

can perform with genes. A company would not normally "market," "offer," or "sell"

genes standing alone. Rather, a company would do those things with seeds containing

the genes. And that is precisely the right that was carved out of the MS Tech license

and granted to Stine Seed in Article 2.1.1 of Stine Seed's license—the right "solely to

increase, market, distribute for sale, sell and offer for sale SOYBEAN *seeds* containing

the BAYER SOYBEAN EVENTS and/or the M.S. SOYBEAN EVENTS." A373

(emphasis added).

The district court also placed great emphasis on the word "divest," reasoning

that Bayer's "interpretation is inconsistent with the recital provision that indicates that

Bayer was divesting itself of the assets at issue." A8976. But the first preamble

merely says that Bayer "has decided to divest the ASSET," where "ASSET" is defined

to mean the physical research material including cells containing the eight Bayer

soybean genetic events. A333-A334. Bayer was indeed divesting itself of this material

by selling it and physically transferring it to MS Tech under Article 2.1.1. A338. But

the preamble did not say that Bayer was divesting its patent rights. Rather, the first

preamble makes clear that Bayer retained ownership of its patents and "grant[ed]

*Confidential material subject to protective order was redacted from this page*

licenses" under them.  A333.  There is nothing at all inconsistent with divesting the physical research materials but retaining the patents themselves, or with divesting the physical research materials and splitting up license rights such that Stine Seed had the right to commercialize the patented technology in the form of seeds.[3]

### B.    The Economics And Structure Of The Deal Support Bayer

In addition to the plain text of the license agreements, the economics and structure of the deal also support Bayer's argument that MS Tech did not receive commercialization rights.

Most importantly, the difference in the prices paid by MS Tech and Stine Seed confirm the different bundles of rights that each entity received.  MS Tech paid $1 million for its research license.  A343 at Art. 4.1.  Stine Seed, by contrast, paid $4.6 million for its far more valuable rights that included commercialization.  A374 at Art. 3.1.  Indeed, the acquisition of rights to the *dmmg* gene for use in soybeans was part of a larger deal where MS Tech and Stine Seed obtained rights to other Bayer herbicide-resistance genes and technology for soybeans and corn.  For the entire package, Stine Seed paid ███████████ while MS Tech paid just ███████. A7420.  These facts

---

[3] The district court also reasoned that "Dow's construction is more consistent with the need, in the Stine Agreement, for MS Tech to specifically consent to that agreement, since there would be no need to consent to non-overlapping rights." A8976.  Not so.  The fact that MS Tech consented to Stine Seed's license in ████ ███ of that license is simply indicative of the fact that MS Tech and Stine Seed had to work together in order to bring *dmmg* soybeans to market, as ████████ reflects: ███████████████████████████████████████████████████ ███████████████████████████████████████████

confirm that Stine Seed received the more economically valuable commercialization rights.

The reasonableness of Bayer's interpretation also flows from basic considerations of the deal itself. If Dow's interpretation of MS Tech's license were correct, why would Stine Seed have bought a separate commercialization license at all? If Bayer had truly granted MS Tech fully sublicensable commercialization rights for $1 million, MS Tech could have immediately granted a commercialization sublicense (the same sublicense it purportedly granted to Dow that lost Bayer this case) to Stine Seed. The two companies were corporate relatives and shared the same management. Harry Stine (Stine Seed's namesake) was both an officer of Stine Seed and a manager of MS Tech. A9762 at 7:13-16 (Stine Dep.). There would have been no need for Stine Seed to pay an additional $4.6 million for its own commercialization license from Bayer if it could have obtained a sublicense from its corporate sibling MS Tech for free.

But the district court ultimately disagreed. It believed that "[i]t made no commercial sense for MS Tech to pay one million dollars only for development rights" and that "[t]he business deal made no sense" if MS Tech could not commercialize. A19, A22. But the rights to research and develop important herbicide-tolerance technology are not worthless on their own. And Bayer respectfully submits that the district court may have been concluding that the business deal made no sense if neither MS Tech nor Stine Seed had commercialization rights. All would agree, which is why the Stine Seed agreement conveys those commercial

*Confidential material subject to protective order was redacted from this page*

rights, which could be exercised if Stine Seed and MS Tech worked together.[4]  This would occur under Article 2.1.1 of Stine Seed's license, which allows commercialization "under brands owned by [Stine Seed] and/or its AFFILIATES." A373.  MS Tech is an affiliate of Stine Seed.  *See* A370, A736 n.2. ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████  A373.  The key, though, is that the commercialization rights stop at Stine Seed and its affiliates.  Bayer did not give MS Tech a license to dilute the value of its patents down to zero by sublicensing commercialization rights to any and all other competitors in the market.  The restriction on Stine Seed's ability to sublicense

---

[4] This reality explains Article 3.1.5 and Exhibit 3.1.5 to MS Tech's license.  These provisions granted MS Tech a sublicense ████████████████████████ covering glyphosate tolerance technology.  A362-64.  Bayer had a license to these ████████████████████, and Bayer had to ████████████████████  A8161-62 at § 4.  In Exhibit 3.1.5, MS Tech agreed to pay these ████████████████████ (so Bayer could satisfy its obligations to ████████) "in the event that PURCHASER (*or any of its Affiliates*, or subsidiaries or successors), either directly or indirectly, Commercialize a Licensed Product."  A363 at § B(a) (emphasis added).  Contrary to the district court's view, A8976, this language does not indicate that MS Tech itself received fully sublicensable commercialization rights in Article 3.1.2.  Rather, it proves that MS Tech and Stine Seed could only commercialize Bayer's patented technology by working together and utilizing Stine Seed's non-sublicensable commercialization rights.  The selling of soybean seeds containing the technology by Stine Seed would constitute direct or indirect commercialization by MS Tech or an "Affiliate" of MS Tech, ████████████████████████████████████████████

commercial rights is meaningless if its corporate affiliate, which shared the same management, had an unfettered right to do exactly that.

### C.    Evidence In The Record Supports Bayer

Evidence in the record also supports the interpretation of the Bayer-MS Tech license agreement compelled by the text and structure of the contract and the licensing deal.

First, the record includes a declaration from Margaret Keating, Vice President and Associate General Counsel for Bayer CropScience LP.  A5767-68 at ¶ 1.  Ms. Keating participated in the negotiation and drafting of the 2004 license agreements with MS Tech and Stine Seed.  A5769 at ¶ 9, A5771-72 at ¶¶ 14-15.  In February 2004, Ms. Keating participated in a conference call in which MS Tech's corporate counsel, Joseph Saluri, asked that the soybean license be "'split up' … into two pieces."  A5774 at ¶ 22.  Ms. Keating then worked with another Bayer employee (Senior Counsel Inge Basteleuers) "in drafting the 'splitting up' of the glyphosate tolerance soybean license into commercial and non-commercial pieces (to Stine Seed and MS Tech, respectively)."  A5775 at ¶ 24.  To accomplish this, the parties inserted the "exception" clause in Articles 3.1.1 and 3.1.2 as well as the "carve out" preamble, the effect of which "was to 'carve out' the commercial rights from MS Tech's agreement, so that they could be granted to Stine Seed in a separate agreement."  A5775-76 at ¶ 25.  Ms. Keating testified to the same effect in her deposition.  *See, e.g.*, A7443.

33

*Confidential material subject to protective order was redacted from this page*

The record also contains an email exchange between Joseph Saluri (MS Tech's corporate counsel) and Inge Basteleurs (a senior counsel at Bayer working on drafting the licenses) concerning the drafting of the split-up language.  A5789.  ████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

*Id.* (emphasis added).  Mr. Saluri responded with proposed language that became the basis of the license-grant paragraphs in the MS Tech and Stine Seed license agreements.  *Id.*

As mentioned earlier, Bayer also submitted a declaration from Lord Collins of Mapesbury, a former Justice of the Supreme Court of the United Kingdom.  A7940.  In Lord Collins's view, the relevant provisions of the license agreements read in conjunction with applicable principles of English contract law compelled the conclusion that "MS Tech … had no license to commercialise the seeds."  A7959-60 at ¶ 58(8).  Lord Collins found "the limitation in Article 3.1.2 of the MS Tech Agreement on the grant of the exclusive license" to be "clear on its face."  A7964 at ¶ 65.  This was especially so, Lord Collins explained, because of "the Sixth Recital which recites that some rights regarding the relevant events are to be granted to Stine Seed and hence carved out of the MS Tech Agreement."  *Id.* (internal quotation marks omitted).  In light of the carve-out recital Lord Collins found it "impossible … to read the exception simply as a limitation on exclusivity."  A7965 at ¶ 70.  "As a result," Lord Collins concluded, "MS Tech is not able to commercialise the seeds directly by

*Confidential material subject to protective order was redacted from this page*

itself, but it has rights which ████████████████████████████████████

████████ Stine Seed will need to obtain to enable Stine Seed effectively to exercise its

rights under the Stine Seed Agreement." A7964 at ¶ 67.

Notwithstanding all of this evidence in favor of Bayer's interpretation of the

license agreements, the district court granted summary judgment to Dow. In doing

so, the district court relied on self-serving testimony from MS Tech's manager (Harry

Stine) and MS Tech's own lawyers (Joseph Saluri and Edward Mansfield). A8961-62.

While these witnesses unsurprisingly testified in favor of Dow's interpretation, other

witness testimony and evidence supported Bayer's interpretation. Margaret Keating,

who negotiated and drafted the relevant license agreements on behalf of Bayer,

testified at her deposition that she "would not agree that MS Tech under the terms of

their … license alone had the right to sell seed containing an MS soybean event."

A7443 at 56:15-24. Ms. Keating said the same thing in her sworn declaration,

explaining that "[t]he effect of" revisions made at MS Tech's and Stine Seed's request

"was to 'carve out' the commercial rights from MS Tech's agreement, so that they

could be granted to Stine Seed in a separate agreement. A5775-76 at ¶ 25. At the

very least Ms. Keating's testimony created a material question of fact that Bayer in

good faith believed should have precluded summary judgment. *See* Fed. R. Civ. P.

56(a). And Ms. Keating's testimony shows that the district court was incorrect in its

assessment that "the record was <u>undisputed</u> that Bayer granted MS Tech an exclusive

license to sell the product associated with [Bayer's] patents," A15 (emphasis in

original), and that "[t]here was not one piece of evidence to support Bayer's position,"
A22.

The district court also placed considerable emphasis on testimony from Bayer's
witnesses to the effect that "Bayer did not care how the assets were divided between"
MS Tech and Stine Seed.  A8972.  For example, the district court cited the following
exchange from Margaret Keating's deposition:

> Q.  Going back to what was on your mind in 2003, 2004, did Bayer care
> how MS Tech and Stine divided up the assets and IP that it was
> acquiring? …
>
> A:  I don't believe that – that we cared as between those companies how
> it was divided up.  We wanted to be very sure that what we were
> transferring was appropriate and was only as broad as it needed to be,
> but with respect to the glyphosate tolerance soybeans, because that was
> – that split up was at the request of MS Tech at the time or MS Tech
> and Stine, that group, I don't recall that we had a strong opinion who
> would receive which of the rights.

A7454 at 97:7-24 (Keating Dep. 97:7-24).  This testimony is in no way inconsistent
with Bayer's interpretation of the license agreement.  The fact that Bayer did not
subjectively care *how* the rights were split up between MS Tech and Stine Seed does
not call into question the reality that the rights *were in fact* split up.

The district court also cited testimony from David Morgan, a former Bayer
employee who "explained at this deposition … that the purchasers, MS Tech and
Stine, were able to make 'full use' of the *dmmg* technology."  A16.  The district court
also cited a congratulatory email that Mr. Morgan sent to Harry Stine following the
close of the deal in which Mr. Morgan said "we are convinced that in your capable

hands these 'products' will find their true worth in the market." A18 (emphasis and internal quotation marks omitted). Again, this testimony and evidence is perfectly consistent with Bayer's interpretation of the license agreements. Bayer agrees that MS Tech and Stine Seed could commercialize *dmmg* by working together and utilizing Stine Seed's commercialization license. The relevant question is whether MS Tech alone had commercialization rights that it could sublicense to Dow. Mr. Morgan never said that was the case.

## II.    THE DISTRICT COURT ABUSED ITS DESCRETION BY CONCLUDING THAT THIS CASE IS "EXCEPTIONAL"

Notwithstanding Bayer's reasonable arguments based on the text of the relevant license agreements, the price and structure of the licensing deal, and evidence in the record, the district court saw things differently. The district court granted summary judgment in favor of Dow on its sublicensing defense, A8984, and this Court affirmed. *Bayer CropScience*, 580 F. App'x 909 (Fed. Cir. 2014).

Bayer is not here seeking to re-litigate the district court's summary judgment decision or this Court's affirmance. But the § 285 inquiry necessarily requires revisiting the merits to determine whether the case "stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case)." *Octane Fitness*, 134 S. Ct. at 1756. This case does not stand out because Bayer advanced a reasonable position and litigated the case in a reasonable way.

## A.     The Fact That Bayer Lost Does Not Make This Case Exceptional

First, the fact that Bayer lost does not make this case an exceptional one.  That is true as a definitional matter.  Every patent case has a winner and a loser, but attorney fees may only be awarded in "exceptional" cases, meaning cases that "stand[] out from others." *Octane Fitness*, 134 S. Ct. at 1756.  Therefore, the fact that the district court ultimately disagreed with Bayer's position does not make the case exceptional.  As this Court has explained, "it is the 'substantive *strength* of the party's litigating position' that is relevant to an exceptional case determination, not the *correctness* or eventual success of that position." *SFA Sys., LLC v. Newegg Inc.*, 793 F.3d 1344, 1348 (Fed. Cir. 2015) (emphasis in original) (quoting *Octane Fitness*, 134 S. Ct. at 1756).  "A party's position on issues of law ultimately need not be correct for them to not 'stand out,' or be found reasonable." *Id.*; *see also Gaymar Indus.*, 790 F.3d at 1373 ("[F]ee awards are not to be used 'as a penalty for failure to win a patent infringement suit.'  In other words, fees are not awarded solely because one party's position did not prevail." (internal citations omitted) (quoting *Octane Fitness*, 134 S. Ct. at 1753)).

This Court's affirmance of the district court's summary judgment decision under Federal Circuit Rule 36 does not indicate that Bayer's position was exceptionally weak or that the case was exceptional.  Under Rule 36 the Court "may enter a judgment of affirmance without opinion" if it determines that "the record supports summary judgment" and "an opinion would have no precedential value." Fed. Cir. R. 36(c).  The appeal of the district court's summary judgment decision in

this case was possibly amenable to a Rule 36 disposition because the appeal was fact-bound and turned on unique contract-interpretation questions (governed by English law, no less) that would have no precedential value outside of this case.

Moreover, a "Rule 36 judgment[ ] only affirm[s] the judgment of the lower tribunal." *TecSec, Inc. v. Int'l Bus. Machs. Corp.*, 731 F.3d 1336, 1343 (Fed. Cir. 2013). It "simply confirms that the trial court entered the correct judgment. It does not endorse or reject any specific part of the trial court's reasoning." *Rates Tech.*, 688 F.3d at 750. This Court has rejected the argument that an appeal decided by a Rule 36 affirmance is necessarily frivolous for purposes of awarding sanctions under Federal Rule of Appellate Procedure 38. *Sparks v. Eastman Kodak Co.*, 230 F.3d 1344, 1345 (Fed. Cir. 2000). It follows that a Rule 36 affirmance does not necessarily mean that a case is exceptional for purposes of awarding attorney fees under § 285. Indeed, this Court has reversed a § 285 fee award as an abuse of discretion where the underlying merits appeal was decided by a Rule 36 affirmance. *See Biax Corp. v. Nvidia Corp.*, 498 F. App'x 998 (Fed. Cir. 2013) (mem.) (per curiam) (Rule 36 affirmance on merits appeal); *Biax Corp.*, ___ F. App'x ___, 2015 WL 755940, at *3-*4 (reversing § 285 fee award as abuse of discretion because "there was nothing unreasonable about [plaintiff's] infringement position" even though it was ultimately unsuccessful).

### B.    Bayer's Position Was Reasonable

Although Bayer's litigation position was not ultimately successful, there can be no doubt that Bayer's position was reasonable. As set forth above, *see supra* Section I,

Bayer had reasonable arguments based on the text of the license agreements, the price and structure of the deal, and evidence in the record that Dow could not have obtained a commercialization sublicense from MS Tech. The district court ultimately disagreed with Bayer's arguments, but the district court's reasons for siding with Dow over Bayer are subject to reasonable debate as well.

Although this Court has decided relatively few cases under § 285 since the Supreme Court's decisions in *Octane Fitness* and *Highmark*, the Court's decisions indicate that a district court abuses its discretion by awarding attorney fees where a party's position was "objectively reasonable," even if ultimately unsuccessful. *Biax Corp.*, ___ F. App'x ___, 2015 WL 755940, at *2. In *Biax Corp.*, the district court awarded fees under § 285 after concluding that the plaintiff "had no reasonable theory of infringement" after the district court's claim construction decision. *Id.* This Court reversed, noting that neither expert testimony nor the claim construction decision "foreclosed" the plaintiff's infringement theory "and there was nothing unreasonable about [plaintiff's] infringement position." *Id.* at *4.

Bayer's position on Dow's licensing defense had at least as much merit as the ultimately unsuccessful infringement position in *Biax Corp.* Indeed, another sitting federal judge agreed that Bayer's reading of the Bayer-MS Tech license agreement was at least plausible. Judge Richard G. Andrews presided over the case at the outset and denied Dow's motion to dismiss based on its licensing defense. Judge Andrews remarked that he did not think the relevant contracts "made out a bulletproof

licensing defense." A759:23-24. And Judge Andrews's opinion denying Dow's motion to dismiss describes the contracts in a manner that accords with Bayer's position: "The Bayer-MS Tech License grants MS Tech the right to 'exploit' the soybean technology, although it may exclude the commercialization rights granted to Stine. This would allegedly allow MS Tech to conduct research and work with government regulators in relation to the soybean technology, but would not allow it to sell or market the technology." A736 (internal citations and footnote omitted). The fact that another sitting federal judge reviewed the same contracts and concluded that Bayer's position was at least plausible under the contracts is strong evidence that Bayer's litigating position regarding Dow's license was "objectively reasonable." *Biax Corp.*, __ F. App'x __, 2015 WL 755940, at *2.

Lord Collins also agreed with Bayer's position and testified that Bayer's interpretation of the contract was correct—that MS Tech got no commercialization rights because those were carved out and granted to Stine Seed in a separate agreement. The district court declared this case exceptional and Bayer's position out-of-bounds, even though a former Justice of the Supreme Court of the United Kingdom offered his professional opinion that Bayer's reading of the plain language was right, and another Article III judge (Judge Andrews) rejected Dow's position and offered qualified support to Bayer's interpretation. Bayer's position was reasonable, and the case was not exceptional—even though Bayer lost.

41

*Confidential material subject to protective order was redacted from this page*

### C.    Bayer Did Not Engage In Litigation Misconduct Regarding The Ownership Of Enlist E3

The district court also accused Bayer of engaging in litigation misconduct by taking inconsistent positions regarding the ownership of Enlist E3 in this action and in the *Bayer III* arbitration.[5]  A23-A25.  Not so.  Bayer lost on the ownership question in this case and then hoisted Dow upon its own petard in the *Bayer III* arbitration.  Making lemonade out of lemons is good lawyering, not litigation misconduct.

In this case, Bayer argued that Dow and MS Tech jointly owned Enlist E3 because of ample evidence supporting such a conclusion.  The relevant paragraph from Bayer's summary judgment brief is reproduced below:



A7122 (citing A7335-36, A7395-409, A7710-82, A7820).

---

[5] As a reminder, the *Bayer III* arbitration involves Dow's breach of its 1992 license agreement with Bayer concerning use of the *pat* gene in Enlist E3 to confers resistance to glufosinate.  The arbitral panel recently found in Bayer's favor and ordered Dow to pay more than $455 million.  *See supra* at 19-21.

The consequence of that joint ownership, according to Bayer, was that Enlist E3 was not "made by or for" MS Tech, as required to make it sublicensable under the MS Tech license agreement. A337, A339, A7120-25. The logic of that argument is easy to understand. If Dow is a joint owner, then it would be hard to say that Enlist E3 was made just for MS Tech. Suppose that two condominium owners have a common garden. If one owner weeds the garden, an ordinary user of the English language would not say that the weeding was done "for" the other owner, but rather "for" them both. The question is whether "for" means "for MS Tech only" or "for MS Tech along with potentially anyone else." Bayer's argument that the former was correct was not "objectively unreasonable." *Biax Corp.*, __ F. App'x __, 2015 WL 755940, at *2.

Dow, for its part, argued in this case that "MS Tech owns the [E3] event," and made clear that this meant to the exclusion of Dow. A4460 ("Here, [Dow] and MS Tech agree that MS Tech owns the event." (emphasis removed)). The district court sided with Dow and held the same. A8979-80 ("There is no dispute that MS Tech owns E3."). Once the district court agreed with Dow that MS Tech was an owner of Enlist E3 and Dow was not, Bayer took that ruling and its estoppel effects into the *Bayer III* arbitration.[6] *See* A16503-04 (Bayer's Reply Memorial). Was Bayer supposed

---

[6] In its fee award the district court criticized Bayer for telling the arbitral tribunal, in its reply memorial submitted *after* the district court's summary judgment ruling, "that 'MS Tech has always owned the Enlist E3 event,' and that this was 'undisputed.'" A23 (quoting A16513). The district court faulted Bayer for repeating the court's own

*Confidential material subject to protective order was redacted from this page*

to persist in arguing that Dow (jointly) owned Enlist E3 in the face of a federal court judgment that MS Tech was the sole owner?  Anyway, Bayer would have been ultimately estopped from pursuing a joint ownership theory in the *Bayer III* arbitration, by the district court's own judgment.  Dow was also estopped from pursuing a joint ownership theory in the *Bayer III* arbitration, even though it would have dearly loved to have done so.[7]

As explained above, *supra* at 20, Dow was between a rock and a hard place with respect to ownership of Enlist E3 in the *Bayer II* and *Bayer III* cases because of conflicting license agreements.  In *Bayer II*, Enlist E3 had to be made "by or for" MS Tech in order for Dow to have a sublicense to *dmmg*.  In *Bayer III*, by contrast, Judge Bumb's acceptance of Dow's argument and finding that MS Tech was the sole owner of Enlist E3 dictated that Dow lost the arbitration.

---

holding to the arbitration panel nearly verbatim.  A8979-80 ("There is no dispute that MS Tech owns E3.").  First, Bayer's joint ownership theory came directly from ███████ and is also consistent with MS Tech being an owner of Enlist E3.  Second, after the district court held that MS Tech was the sole owner, how was Bayer responsibly to argue to the contrary in the arbitration?  A conclusion of litigation misconduct begs the question, unanswered by the district court, of what Bayer was supposed to do in the arbitration in light of the summary judgment ruling.

[7] Instead of arguing joint ownership, which it could not because of estoppel, Dow put forth an exceptionally odd theory.  Dow's idea is that even though MS Tech owned Enlist E3, it did not need a license to Bayer's *pat* gene (contained in Enlist E3 and not sublicensable by Dow to MS Tech).  ████████████████████████████████████
████████████████████████████████████████████████████████
It is easy to see why Dow lost the arbitration advocating this sort of contrivance.

In its award, the arbitration panel concluded that by "the effect of issue estoppel or otherwise," it "must" "accept[]" the "*Bayer II* finding that Enlist E3 is indeed an MS Tech event, not a Dow event." A19858 at ¶ 310. The panel found Dow to be in breach by virtue of this fact: "As decided and confirmed on appeal in *Bayer II*, and as acknowledged by both parties in this Arbitration, Dow made Transformants 'for' MS Tech. Dow could not validly license these Transformants to MS Tech under [the 1992 license], because they were not Dow's Transformants." A19841 at ¶ 253 (footnote omitted). In other words, Dow breached its 1992 license agreement with Bayer concerning the *pat* gene because under that agreement Dow could not sublicense the *pat* gene patent rights to a third party. A19829 at ¶ 220.

All Bayer did was argue to the panel that Dow should be bound by the district court's determination that Enlist E3 was made "for" MS Tech. A16504 at ¶¶ 141-43 (Bayer's Reply Memorial). That is called estoppel. Bayer did nothing wrong by seeking application of that principle to hold Dow to the consequences of a position it advocated (and prevailed on) regarding the same issue in another forum. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (explaining that under "rule" of "judicial estoppel" "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position"). The district court's implicit suggestion that Bayer should have unilaterally surrendered this argument or face its *post hoc* charges of litigation misconduct and a § 285 finding punishes Bayer for

refusing to agree to lose both cases on irreconcilable factual theories. It is not "exceptional" that Bayer did not choose to commit this form of litigation suicide in the arbitration and used Dow's ownership victory against it.

In sum, the district court's finding of litigation misconduct rests on the view that Bayer should have continued to argue that Dow had an ownership interest in Enlist E3 even after the district court entered a judgment to the contrary. Instead, Bayer chose to, in the arbitration, take advantage of Dow's victory on the ownership issue in this case. It would have been "exceptional[ly]" bad lawyering to have done anything else. The district court's conclusion that Bayer engaged in litigation misconduct by accepting the district court's own finding and using it against Dow in the arbitration was an abuse of distraction. *See Highmark*, 134 S. Ct. at 1748 n.2 (ruling based on "a clearly erroneous assessment of the evidence" is an abuse of discretion (internal quotation marks omitted)).

### D.    The District Court's Other Reasons For Finding This Case "Exceptional" Do Not Withstand Scrutiny

The district court's fee award also cites a handful of other instances of what the district court viewed as unreasonable litigation steps by Bayer as justification for its exceptional-case finding. It is apparent, however, that the district court's view of Bayer's litigation decisions was driven entirely by its view of Bayer's position on the merits. In other words, the district court viewed Bayer's litigation decisions as

unreasonable only because they were in connection with a position that the court believed to be wholly without merit.

For example, the district court criticized Bayer's due diligence. It said that, "[h]ad Bayer done any due diligence, it would have learned that no witness supported Bayer's construction of the Agreement and this case … should never have been filed." A27. But as shown above, Bayer did have witnesses who supported its case. Margaret Keating testified that she "would not agree that MS Tech under the terms of their … license alone had the right to sell seed containing an MS soybean event." A7443 at 56:15-24; *see also supra* at 33 to 35. And Lord Collins affirmed that Bayer's interpretation of the plain language of the agreement was correct under English law. A7959-64.

The district court also criticized Bayer for filing a motion for preliminary injunction at the preliminary stage of the case. As it saw things, "Bayer's filing of the motion for preliminary injunction early in this litigation was frivolous and unnecessarily increased the costs of litigation." A29. The district court gave two reasons for this conclusion: (1) "Judge Andrews had already established filing and discovery deadlines," and (2) "Bayer claimed no further discovery was necessary to decide the motion" even though depositions were ongoing in which "Bayer's own witnesses debunked Bayer's claims." A29-30.

As to the first reason, there was nothing unusual about the timing of Bayer's motion. Bayer filed its preliminary injunction motion on February 19, 2013, A794—

47

two months after Judge Andrews denied Dow's motion to dismiss, A742. Filing a preliminary injunction motion early in litigation is *de rigueur*. The purpose of a preliminary injunction is to "preserv[e] the status quo." *Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1578 (Fed. Cir. 1983). That function is best served if a party moves early in litigation before the status quo can be upended. That was especially true here. As Bayer explained in its preliminary injunction motion, Bayer faced a strong likelihood of irreparable harm if Dow could bring Enlist E3 to market first because it would diminish the value of Bayer's own three-gene soybean, which Bayer had spent many years (and a great deal of money) developing. A816-17.

The second reason is, again, simply a telegraph of the district court's view of the merits of Bayer's case. The district court thought that the deposition testimony of Bayer's own witnesses (by which the district court seemed to mean David Morgan and Margaret Keating) "debunked" Bayer's case. A30. But as shown above, *supra* at 33 to 35, Margaret Keating's testimony unequivocally supported Bayer's interpretation, and David Morgan's testimony was not contrary to Bayer's interpretation.

## **CONCLUSION AND STATEMENT OF RELIEF SOUGHT**

The district court's award of nearly $6 million in attorney fees under § 285 is an abuse of discretion. It took what was, at best, a close case in Dow's favor and, through a retelling, made the result appear a foregone conclusion and Bayer's positions therefore unreasonable. For the reasons set forth above, Bayer respectfully

requests that the Court reverse the district court's award of attorney fees to Dow

under 35 U.S.C. § 285.


November 20, 2015                              Respectfully submitted,

                                              /s/ Adam K. Mortara

Robert J. Koch                                Adam K. Mortara
MILBANK, TWEED,                               BARTLIT BECK HERMAN
   HADLEY & MCCLOY LLP                           PALENCHAR & SCOTT LLP
1850 K Street, NW, Suite 1100                 54 W. Hubbard Street, Suite 300
Washington, DC 20006                          Chicago, IL 60654
Tel: (202) 835-7500                           Tel: (312) 494-4400
Fax: (202) 263-7586                           Fax: (312) 494-4440
rkoch@milbank.com                             adam.mortara@bartlit-beck.com

Christopher J. Gaspar                         Daniel C. Taylor
MILBANK, TWEED,                               BARTLIT BECK HERMAN
   HADLEY & MCCLOY LLP                           PALENCHAR & SCOTT LLP
28 Liberty Street                             1899 Wynkoop Street, 8th Floor
New York, NY 10005                            Denver, CO 80202
Tel: (212) 530-5000                           Tel: (303) 592-3100
Fax: (212) 530-5219                           Fax: (303) 592-3140
cgaspar@milbank.com                           daniel.taylor@bartlit-beck.com

                                              *Counsel for Plaintiffs-Appellants*
                                              *Bayer CropScience AG and Bayer S.A.S.*

# ADDENDUM

## TABLE TO ADDENDUM

| DOCUMENT | PAGES |
|---|---|
| Order re Defendant's Motion for Fees & Costs as Prevailing Party Docket No. 395, dated March 13, 2015 | A1-A3 |
| Opinion re Defendant's Motion for Fees & Costs as Prevailing Party Docket No. 394, dated March 13, 2015 | A4-A35 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

BAYER CROPSCIENCE AG, et al.,

                Plaintiffs,

     v.

DOW AGROSCIENCES LLC,

                Defendant.

Civil No. 12-256 (RMB/JS)

**ORDER**

THIS MATTER having come before the Court pursuant to Federal Rule of Civil Procedure 72(a); and

THE COURT NOTING that Defendant filed a Motion for Fees and Costs as Prevailing Party [Docket No. 317]; and

THE COURT FURTHER NOTING that on December 22, 2014, United States Magistrate Judge Joel Schneider filed a Report and Recommendation in this case [Dkt. Nos. 374 and 384 (Amended)] recommending the Defendant's motion be granted in part and that Defendant should be awarded $5,761,936.79 in fees; and

THE COURT NOTING that Plaintiffs filed Objections to the Report and Recommendation pursuant to Fed. R. Civ. P. 72 and L. Civ. R. 72.1(c)(2) [Dkt. No. 388]; and

THE COURT NOTING that it has reviewed the submissions by the parties with respect to the Report and Recommendation; and

THE COURT FINDING that, after review, that this Court shall adopt Judge Schneider's Report and Recommendation, and agrees that Dow is entitled to attorney's fees; and

THE COURT FURTHER FINDING that it shall reserve decision on the amount of fees Defendant is entitled to pending a hearing on the issue; and

THE COURT FURTHER FINDING that if Defendant provides unredacted bills to the Plaintiff prior to the hearing date, the need for a hearing may be obviated;

IT IS on this **13th** day of **March 2015**, hereby

**ORDERED AND ADJUDGED** that the Report and Recommendation is adopted with respect to Plaintiffs' liability for fees and Defendant shall be awarded attorney's fees pursuant to 35 U.S.C. § 385; and it is further

**ORDERED** that the decision on the amount of fees to be awarded is reserved; and it is further

**ORDERED** that Defendant shall have three (3) weeks from the entry of this Order to provide revised billing statements in the event it chooses to do so; and it is further

**ORDERED** that in the event Defendant provides revised billing statements, Plaintiffs shall have three (3) weeks from the receipt of such statements to file Objections and Defendant shall have two (2) weeks to file a response to those Objections; and it is further

A2

ORDERED that in the event Defendant does not file revised billing statements, the Court will conduct oral argument on June 4, 2015 at 10:00am, at which time the parties shall be prepared to: (1) discuss the basis for each redacted entry; (2) be prepared to turn over a non-redacted entry at the time if Ordered to do so; and (3) discuss any objection to such entry.

s/Renée Marie Bumb
RENÉE MARIE BUMB
United States District Judge

A3

NOT FOR PUBLICATION                    [Docket Nos. 317, 374 & 384]

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BAYER CROPSCIENCE AG, et al., | |
| Plaintiffs, | |
| v. | Civil No. 12-256 (RMB/JS) |
| DOW AGROSCIENCES LLC, | **OPINION** |
| Defendant. | |

Appearances:

Robert J. Koch                        Peter A. Bicks
Stephanie R. Amoroso                  James L. Stengel
Edward J. Mayle                       Alex V. Chachkes
Milbank, Tweed, Hadley &              Orrick, Herrington &
 McCloy LLP                            Sutcliffe LLP
1850 K Street NW, Ste. 1100           51 West 52nd Street
Washington, DC 20006                  New York, New York  10019

Fredrick M. Zullow                    Elizabeth A. Howard
Christopher J. Gaspar                 Orrick, Herrington &
Milbank, Tweed, Hadley &              Sutcliffe LLP
 McCloy LLP                           1000 Marsh Road
1 Chase Manhattan Plaza               Menlo Park, California  94025
New York, New Your 10005

                                      Steven J. Balick
Frederick L. Cottrell, III            Lauren E. Maguire
Jeffrey L. Moyer                      Andrew C. Mayo
Travis S. Hunter                      Ashby & Geddes
Richards, Layton & Finer, P.A.        500 Delaware Avenue, 8th Floor
One Rodney Square 920 North           P.O. Box 1150
 King Street                          Wilmington, DE 19899
Wilmington, DE 19801

                                          Attorneys for Defendant

Attorneys for Plaintiffs

**Bumb**, J. (by designation):


This matter is before the Court upon a Report and

Recommendation issued by the Honorable Joel Schneider, United

States Magistrate Judge [Docket Nos. 374, and 384 (Amended)] ("Report and Recommendation") relating to Defendant Dow Agrosciences, LLC's ("Dow") Motion for Fees and Costs as Prevailing Party [Docket No. 317] against Plaintiffs Bayer Cropscience AG, et al. ("Bayer"). Bayer has filed its Objections to the Report and Recommendation [Docket No. 388] ("Bayer Obj."). Judge Schneider found that based on the totality of the circumstances, Bayer's Complaint was "so plainly non-meritorious that no reasonable party or attorney could realistically expect success. Bayer's complaint should not have been filed. The exceptional nature of the case is compounded by the lack of pre-suit due diligence." Report and Recommendation, at 19. For the reasons that follow, the Court adopts Judge Schneider's Report and Recommendation and will award fees to Dow. The Court reserves on the amount to be awarded.

I.   Procedural History

On June 29, 2012, Bayer filed the within patent infringement suit against Dow. The Complaint alleged infringement by Dow of seven patents owned by Bayer involving certain soybean technology, specifically the *dmmg* gene that confers resistance to the herbicide glyphosate. The Complaint sought to enjoin Dow from selling its Enlist E3 soybean seeds

that contain a "Triple Gene Event" which includes the *dmmg* gene.[1]
On October 17, 2013, this Court granted summary judgment in
favor of Dow.  Bayer appealed, and the Court of Appeals for the
Federal Circuit affirmed without opinion.

A.   Pre-Complaint Conduct

In the earlier filed Bayer I, see n.1, Bayer filed a motion
for leave to add infringement claims relating to the seven
patents covering the *dmmg* gene.  The parties spent months
briefing the motion, but four days before the hearing on the
motion, Bayer withdrew it.  Bayer thereafter filed a separate
lawsuit (this one) which was assigned to the Honorable Richard
G. Andrews.  The case was eventually reassigned to this Court

---

[1] As the name implies, the Triple Gene Event comprises three
herbicide-resistant genes.  (The gene's integration into the
plant cell's chromosome is called an "event.")  The first gene,
"*aad-12*," confers resistance to the herbicide "*2,4-D*."  Bayer
had sued Dow for infringement of its patent covering this gene
in Bayer Cropscience Ag v. Dow AgroSciences LLC, Docket No. 10-
1045 (RMB) (D. Del.) before this Court ("Bayer I").  This Court
found non-infringement, and the Federal Circuit affirmed.  The
second gene, "*pat*," confers resistance to the herbicide
"glufosinate."  Bayer has asserted infringement of four of its
patents covering this gene against Dow in the Eastern District
of Virginia.  See Bayer CropScience Ag v. Dow AgroSciences LLC,
No. 12-47 (RAJ) (E.D.Va.) (Bayer III).  Within days of the
filing of the Complaint here, the Court in the Eastern District
of Virginia granted Dow's motion to stay the case pending
arbitration under the parties' license agreement.  The third
gene, "*dmmg*," is the subject of the within suit involving seven
of Bayer's patents related to this gene.

who had already become familiar with the subject matter as a result of Bayer I.[2]

B.  Complaint: Motion to Dismiss

Shortly after the Complaint was filed, Dow filed a Motion to Dismiss the Complaint before Judge Andrews.  [Docket No. 8]. Just as it had argued in its opposition to Bayer's Motion to Amend the Complaint in Bayer I, Dow argued that it had a 2008 sublicense that authorized it to market its E3 product.  Thus, it did not infringe.  More specifically, Dow argued that it had a sublicense related to Bayer's patents to work with MS Technologies, LLC ("MS Tech") to develop a new soybean product. Dow cited a May 28, 2004, Agreement wherein Bayer granted MS Tech a broad license under its seven *dmmg* patents to make and commercialize soybean products having the glyphosate tolerance gene as well as an equally broad right to sublicense such rights (the "Agreement").  Under a derivative 2008 sublicensing agreement between MS Tech and Dow, Dow developed the Triple Gene Event (E3 soybeans) on behalf of MS Tech, with MS Tech providing the *dmmg* gene and Dow providing the *aad-12* and *pat* genes.

---

[2] Dow does not base its motion for attorney's fees based on this pre-complaint conduct nor did Judge Schneider base his recommendation on such conduct.  This Court, too, does not award any fees relating to such conduct but it cannot help but question Bayer's decision to litigate against one defendant, Dow, for its alleged infringement of three different traits in the E3 product – *2,4-D,* glyphosate, and glufosinate – in two separate forums.

4

Bayer opposed the Motion to Dismiss before Judge Andrews, raising several points.  In relevant part, Bayer argued that pursuant to its related agreement with Stine Seed Farm, Inc. ("Stine"), only Stine, not MS Tech, could market seeds under Bayer's patents.  Specifically, Bayer argued:

> Bayer granted to MS Tech exclusive rights to create (and to subcontract to third parties to create) soybean events using Bayer's technology.  MS Tech has additional rights to "exploit" the technology, which include activities such as breeding or using plants incorporating the technology, for example, to obtain regulatory approvals or for other experimental purposes.  <u>However, rights incident to the commercial sale of soybean seeds incorporating Bayer's technology were not given directly to MS Tech</u>.  Those rights were given only to Stine but *cannot be sublicensed*.

[Docket No. 11, at 6] (emphasis added).

Bayer accused Dow of a "gross misunderstanding of the licensing arrangement among Bayer, MS Tech and Stine."  [<u>Id.</u> at 8].  Bayer did not mince words:

> These contractual provisions unambiguously reflect Bayer's deliberate choice to allow Stine − − and only Stine − − to market and sell transgenic soybean seeds that use Bayer technology under a Stine brand or a brand of a Stine affiliate.  The "with the exception of the rights . . . granted to Stine by separate agreement" clause <u>should have alerted [Dow], at minimum</u>, that MS Tech's license from Bayer was not unrestricted.

[<u>Id.</u> at 7] (emphasis added).

After conducting oral argument, Judge Andrews held that Dow's sublicense defense was a "factual" one that prevented the

A8

Court from going beyond the pleadings at the motion to dismiss stage.  [Docket No. 26].

C.  <u>Motion for Preliminary Injunction</u>

Judge Andrews thereafter entered a scheduling order [Docket No. 39] that established February 28, 2014, as the discovery deadline.  However, within one month of the scheduling order, and in the midst of discovery, Bayer filed a motion for a preliminary injunction.  [Docket No. 51].  Bayer did so, knowing that Judge Andrews had set the discovery deadline for Dow's sublicensing defense for April 4, 2013, and the parties were in the midst of extensive discovery (including discovery disputes).  Dow argued that Bayer's motion "threaten[ed] to unravel the discovery."  [Docket No. 61].  Bayer responded, however, that Dow did "not need any discovery beyond what Bayer has already provided to address Bayer's likelihood of success on the merits."  [Docket No. 65].

D.  <u>Summary Judgment</u>

During the pendency of the preliminary injunction motion, the case was transferred to this Court.  The Court established new deadlines and permitted the filing of a motion for summary judgment by Dow based on its licensing agreement defense.  On May 9, 2013, Dow filed a motion for summary judgment.  The Court conducted a two-day hearing on June 13-14, 2013.  On October 7,

A9

2013, the Court granted Dow's motion for summary judgment.
[Docket Nos. 268 (Opinion ("Op.") and 269 (Order)].

In its summary judgment Opinion, this Court agreed that Dow had a valid sublicense from MS Tech to develop and sell E3. The Court found that there were no material facts in dispute. Op. at 16. The Court also found that the arguments Bayer had made were just that, arguments: "this Court has pored over the record for objective evidence to support Plaintiff's arguments . . . it has found none." Op. at 18, n.10. The Court held that the Agreement's license provision was "subject to only one reasonable interpretation [-Dow's]" and that Dow's interpretation was the only one "consistent with the factual matrix and the [Agreement's] business purpose." See Op. at 16 n.6 and 22. The Court further set forth seven reasons why Bayer's position on the license failed under English law, which the parties agreed governed. In sum, the Court found that Bayer's position was contrary to the plain language and business purpose of the Agreement, and that Bayer's arguments rested on contorted theories that amounted to nothing more than distraction.

E.    Motion for Attorney's Fees

On May 19, 2014, after the Federal Circuit's affirmance of this Court's Opinion and the Supreme Court's decision in Octane Fitness, LLC v. ICON Health & Fitness, Inc., 134 S.Ct. 1749

7

A10

(2014), Dow filed a Motion for Fees and Costs as Prevailing Party. [Docket No. 317]. In its motion, Dow argued that this case was an "exceptional case" entitling it to recover its attorney fees pursuant to 35 U.S.C. § 285. The Court referred this matter to Judge Schneider for a Report and Recommendation. On December 22, 2014, after holding a two-day hearing, Judge Schneider entered a Report and Recommendation recommending (1) that Dow's motion be granted, in part, and (2) that Dow be awarded $5,761,936.79 in fees.

Pursuant to Fed.R.Civ.P. 72 and L.Civ.R. 72.1(c)(2), Bayer filed its Objections to the Report and Recommendation. The Court turns to the parties' arguments.

II. Legal Analysis

A. Standard of Review

When a party has objected to a Magistrate Judge's Report and Recommendation, the District Judge "shall make a de novo determination of those portions to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge." L.Civ.R. 72.1(c)(2). A de novo determination "means an independent determination of a controversy that accords no deference to any prior resolution of the same controversy." United States v. Raddatz, 447 U.S. 667, 690 (1980)(Stewart, J., dissenting). Therefore, de novo review "means reconsideration afresh by the

[D]istrict [J]udge in this sense: no presumption of validity applies to the [M]agistrate's findings or recommendations." Greene v. WCI Holdings Corp., 956 F.Supp. 509, 514 (S.D.N.Y. 1997)(quoting 7.2 James Wm. Moore, Moore's Federal Practice, 1 72.04[10.-2], at 72-96 (1995).

### B. "Exceptional Case"

Pursuant to 35 U.S.C. § 285, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."[3]  Whether a case is exceptional is to be determined on a case-by-case basis, considering the totality of the circumstances.  Octane Fitness, LLC v. ICON Health & Fitness, Inc., 134 S.Ct. 1749 (2014).  There is "no precise rule or formula for making" a determination as to whether a case is exceptional.  Biax Corp. v. Nvidia Corp., 2015 WL 755940, *2 (Fed. Cir. February 24, 2015)(citing Octane Fitness).  An exceptional case is one that "stands out from others with respect to the substantive strength of a party's litigating position . . . or the unreasonable manner in which the case was litigated." Id. citing Octane Fitness, 134 S.Ct. at 1756).

The Supreme Court has cited a number of nonexclusive factors district courts may consider, including "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular

---

[3] There is no dispute that Dow is the prevailing party here.

circumstances to advance considerations of compensation and deterrence." Id. at 1756 n.6.  Further, "[d]istrict courts may determine whether a case is exceptional in case-by-case exercises of their discretion, considering the totality of the circumstances." Id. at 1756.  Because the exceptional case designation is guided by the district court's "better position[]" to decide the issue, the finding is committed to the sound discretion of the district court. Hishmak Inc. v. Allcare Health Management System, Inc., 134 S. Ct. 1744, 1748 (2014). Patent litigants are only required to establish their entitlement to fees by a preponderance of the evidence. Octane Fitness, 134 S. Ct. at 1749, 1756.

Among the most commonly cited ways to establish exceptionality are: (1) establishing that the plaintiff failed to conduct an adequate pre-filing investigation or to exercise due diligence before filing suit (see, e.g., Yufa v. TSI Inc., No. 09-01315, 2014 WL 4071902, at *3 (N.D. Cal. Aug. 14, 2014)); (2) showing the plaintiff should have known its claim was meritless and/or lacked substantive strength (id.); (3) evidencing the plaintiff initiated litigation to extract settlements from defendants who want to avoid costly litigation (Summit Data Sys., LLC v. EMC Corp.,  No. 10-749, 2014 WL 4955689, at *3-4 (D. Del. Sept. 25, 2014)); (4) showing a party proceeded in bad faith (Pure Fishing, Inc. v. Normark Corp.,

10

A13

No. 10-2140, 2014 WL 5474589, at *4 (D.S.C. Oct. 28, 2014)
(noting that bad faith is no longer required to support an award
of fees but finding the plaintiff's position was not
reasonable)); and (5) litigation misconduct (Logic Devices, Inc.
v. Apple Inc., No. 13-02943, 2014 WL 6844821, at *4 (N.D. Cal.
Dec. 4, 2014)).

 C. Discussion

  1. Objections to Award

 Bayer first objects to the Report and Recommendation on the
grounds that "only by exaggeration of an otherwise benign record
could this case be deemed exceptional." Bayer Obj. at 2. The
Court flatly rejects Bayer's nonpenitent view. This Court
conducted a two-day hearing on the motion for summary judgment.
Bayer opposed summary judgment on several grounds. Bayer's
case, however, became more anemic upon review of each piece of
evidence. Bayer's own witnesses as well as key documents
contradicted Bayer's contorted reading of the contract.

 Second, Bayer contends that both this Court and the Federal
Circuit were wrong and argues that Bayer did, in fact, retain
its patents. As such, it argues, this evidence supports Bayer's
understanding that MS Tech's commercialization with Dow
infringed its retained patents. Bayer pettifogs. This argument

is a red-herring and must be put to rest.[4]  First, this Court
ruled in its Opinion that the record was clear and undisputed
that in 2003 Bayer had made the decision to get out of the
soybean business.  In connection therewith, Bayer sold the
glyphosate soybean events and the IP rights that came associated
with them.  Yet, in the face of such evidence, Bayer continues
to argue otherwise, that MS Tech could not sell the product
because Bayer retained the patents.  But even assuming Bayer did
retain such rights - an argument that appears to have only first
appeared on appeal — it is not material: the record was
undisputed that Bayer granted MS Tech an exclusive license to
sell the product associated with those patents.  In other words,
that Bayer retained ownership of the patents associated with the
*dmmg* technology is immaterial to whether Bayer nonetheless
granted an exclusive license to MS Tech to commercialize product
under those patents.

Bayer's own witnesses confirmed such conclusion which this
Court found was consistent with the plain text of the Agreement.
First, Margaret Keating, Bayer's in-house counsel, confirmed
this understanding at her deposition.[5]  Second, David Morgan,

---

[4] Bayer unsuccessfully argued this point before the Federal
Circuit as well.

[5]     Q. Going back to what was on your mind in 2003, 2004,
    did Bayer care how MS Tech and Stine divided up the
    assets and IP that it was acquiring?

Bayer's executive who was responsible for Bayer's agricultural seed group at the time, explained at his deposition why Bayer decided to leave the soybean business and that the purchasers, MS Tech and Stine, were able to make "full use" of the *dmmg* technology.[6]  Morgan explained at his deposition:

---

A. Again, you're talking about the -- are we just talking about the glyphosate soybean events or all of the –
Q. Let's say the glyphosate soybean events and the IP that came associated with it.
A. I don't believe that -- that we cared as between those companies how it was divided up.
We wanted to be very sure that what we were transferring was appropriate and was only as broad as it needed to be, but with respect to the glyphosate tolerance soybeans, because that was -- that split up was at the request of MS Tech at the time or MS Tech and Stine, that group, I don't recall that we had a strong opinion who would receive which of the rights.

Keating Deposition, Sigworth Decl., Ex. 38, at 95:6-25-96:12 (emphasis added).

Q. Let's get to the punch line which was: What was the recommendation?
A. The recommendation was that while Bayer had strong positions in certain crop sectors inasmuch that they had both seed assets and biotechnology assets in a number of crops, they did not have a particularly strong position in other major crops, notably corn and soybeans.  And at the time of the 2003 dialogue, we evaluated our options to secure access to corn and soybean genetics by way of looking to acquire companies that would help to establish the footprint for us.
                    . . .
And so this whole process, the one that we're relating to here, is relating to a process to seek the opportunities to - - to explore opportunities with third parties who we felt might be interested in acquiring these assets.

Q. And as - - and as one of the key business people
responsible for this divestiture, is it your view that
that kind of licensing that you discussed was
permissible under these transactions?
A. Yes. I mean I - - <u>I think it was relatively black
and white certainly in my mind that we were divesting
these assets.</u> [MS Tech/Stine] was acquiring these
assets and, of course, <u>the value of these assets for
[MS Tech/Stine] was in [the] ability to make full use
of them.</u>

Docket No. 320-7, at 61-62 (emphasis added).

Morgan continued:

[I]n the divestment of particularly the . . .
glyphosate event that was . . . sold to Mr. Stine,
that he would thereby have the rights to use that in
the future development of his business <u>however he saw
that appropriate to evolve</u> . . . .
Q. And as the business person who was in charge of
this transaction, was that your understanding and
intent?
A. Yes, it was. <u>It seems incongruous that we would
sell an asset to somebody, receive remuneration for
the sale, and then somehow prevent the acquirer from
making use of the asset he just acquired.</u>

<u>Id.</u> at 91 (emphasis added).[7]

---

Docket No. 320-7, at pages 33, 34.

[7] It is clear that Morgan spoke of Stine and MS Tech
interchangeably.

"Sorry. I used the word Stine collectively as the
companies that constitute the Stine group of
companies, so that does absolutely include MS Tech and
Mertec on - - on that side of the Stine business. . .
So we under . . . we understood or we understood that
MS Tech and Mertec were legal entities within the
Stine group who would be signatories to these
transactions as appropriate.

14

A17

The evidence was further undisputed that upon signing the deal, Morgan wrote a congratulatory e-mail to Stine on June 4, 2014. [Docket No. 321-1, page 2]("We wish you every success in capturing the intrinsic value that these assets promise. We were disappointed that Bayer was unable to convert that potential given our (lack of) market presence, but we are convinced that in your capable hands these 'products' will find their true worth in the market")(emphasis added). Cf., Vincent Turries, BioScience Management and Divestment Team [Docket No. 321-1, page 3]("The closing is now done and the seeds have been sent.") (emphasis added).

Thus, the record was clear that Bayer had conveyed the events and IP associated with those events to Stine and MS Tech for the purpose of putting product into the market. The argument now asserted by Bayer, that because it retained the patent rights it was justified in bringing an infringement case against Dow, is fallacy. Even assuming it did retain such patent rights, there was no dispute that when Bayer sold the events it also conveyed the IP rights to make use of the events. The transaction made no business sense, otherwise. As Morgan explained:

So here's a physical hard asset. In order for you to

Id. at 92.

15

A18

make use of this hard asset, we of course would need
to give you the rights under our intellectual property
estate for you to make use of these assets.

Id. at 12-22.

Moreover, as Judge Schneider correctly found, Bayer's

arguments were implausible given the significant amounts of

money paid.  It made no commercial sense for MS Tech to pay

one million dollars only for development rights.  And as

this Court found, it made little sense to define "exploit"

broadly if the parties' intent was for MS Tech to have much

more limited rights.

Witnesses, other than Bayer's witnesses, shared the same

view of the Agreement.  Joseph Saluri, MS Tech's corporate

counsel at the time the agreement was negotiated, testified at

his deposition that the parties understood MS Tech could market

the soybean product.[8]

---

[8] Q. And if you mention there's an exception, what is
that in 3.1.2?
A. So, as we saw on that divestment schedule, the
earlier exhibit, that Stine Seed Farm had paid a
portion of the total of divestment dollars for a right
to increase, market, distribute for sale, offer for
sale.  And it's a different definition of "exploit,"
but they are rights granted to Stine by a separate
agreement that was executed as part of the 14 or so
agreements signed at the conclusion of the divestment.
Q. So if somebody told you that this exception to
Stine limited MS Tech's rights in any way, how would
you respond?
A. That that's ridiculous.
Q. Why is that the case?
A. Because that was clearly not the intent.

Moreover, Edward Mansfield, now a sitting Iowa Supreme Court Justice, and then a contract law professor who worked on the deal and dealt directly with Keating, testified at his deposition that it was very clear to all parties involved in 2004 that MS Tech had the right to commercialize:[9]

---

Q. It says, "an exception."  Exception to what?
A. It's an exception to the exclusivity.  Stine had negotiated a right to sell and market products that would have been taken forward by MS Technologies under this exhibit here.
Q. And then in the agreement with Stine, the license with Stine from Bayer, Stine has to go to MS Tech and get a license, and then they could market, distribute and sell, but they have no right to sublicense, they have no right to breed, they have no right to do some of the other broad allowances under the definition of "exploit" in this Exhibit 502.
Q. Okay.  If someone told you the license in 3.1.2 is to events but not seeds, and it excludes seeds, what would you say to that?
A. I would say that that is probably biologically impossible and nonsensical.
Q. Why is that?
A. Because soybean events are necessarily seed.

Sigworth Declaration, Saluri Dep., at 41-43.

[9] Q. All right. Is there any question in your mind that MS Tech had the right to sublicense to their parties, including our client, Dow AgroSciences, the right to commercialize this Glyphosate-Tolerant Technology that's talked about in this agreement?
A. No, I did not have a question.
Q. And you're both an experienced lawyer and also a judge; you know that there's some cases where you sit there and you say, "This is a close call," and there are others where you say, "Come on.  This is what the agreement says on its face."  Within that spectrum of real disputes versus ones that seem to be kind of covered by the plaintiff - -

A20

Finally, Harry Stine, an officer of Stine Seed and business partner in the deal, testified at his deposition:

> Q. So just to sum it all up, tell me how you feel about Bayer's position that 3.1.2 allows MS Tech to exploit MS Soybean Events, meaning events, but not seeds.
> A. From my perspective, that's an absolutely ridiculous, unreasonable, and never considered definition there.

Docket No. 321-5, at 51-52 (Stine Dep.)

> Q. And what do you think of Bayer's position that non-exclusive here means that Bayer kept rights?
> A. That was never ever discussed and never ever agreed to and never ever brought up during the almost 10 years since we have signed this.
> Q. Would that have made commercial sense?
> A. No.

Id. at 60.

---

> Q. - - in terms of the agreement, can you tell us where you think the question fits in?
> A. I think this was very clear in 2004 that MS Tech had those rights.
> Q. Did anybody at Bayer, during that four-month period of time that you were involved, ever say to you in words or substance that MS Tech could not sublicense the right to commercialize this technology?
> A. No.
> Q. Was the right to sublicense the commercialization prospect for this technology for MS Tech a significant part of this deal?
> A. Yes.
> Q. And can you explain to us why?
> A. Well, for one thing, MS Technologies, as I understood it, was not a huge company. And there could well be a desire to work with other companies in order to bring these glyphosate-resistant traits to market.

Docket No. 322-1, Ex. T. Mansfield Dep. at pages 41-43.

In sum, Bayer's argument that it retained the patents and therefore was justified in pursuing its case against Dow is a fallacious one.  There was not one piece of evidence to support Bayer's position that even if it retained the patents, MS Tech could not make use of them in its commercialization efforts.  The business deal made no sense otherwise.  Bayer's commercialization argument was and continues to be mere obfuscation.

In yet another unfounded argument, Bayer asked this Court to infer that it mattered to Harry Stine whether or not MS Tech commercialized because: "Harry Stine only gets 19 percent versus if MS Tech doesn't sell the seed and only Stine sells the seed, then Harry Stine gets 100 percent, so the inference is Harry Stine does care about MS Tech."  [6/14/13 Hearing Tr. 323:15-23].  This inference was merely contrived lawyer argument.  As the evidence demonstrated, Stine understood that the nature of the relationship was that MS Tech would be able to commercialize.

> Q. So if someone told the court that when you read
> 3.1.1 that that meant that MS Tech couldn't
> commercialize Bayer Soybean Events and Stine could,
> would that be correct?
> A. That would be incorrect.

Stine Dep. 32: 9-13.  Stine's unequivocal acknowledgement that MS Tech could commercialize obliterated Bayer's manufactured inference that because MS Tech paid less, it was not granted

19

A22

commercialization rights.  Moreover, the evidence showed that Bayer did not care how the assets were divided between MS Tech and Stine.  The record was uncontroverted on this point.  As such, Bayer's efforts to defeat summary judgment – on the grounds that the Stine-MS Tech relationship left material disputes of fact - was objectively unreasonable.

Further, Bayer's efforts in this litigation to create an issue as to MS Tech's ownership of E3 and to preclude summary judgment were specious for the reasons this Court previously articulated.  As this Court found, Bayer's creative lawyering did "not trump the reality of the clear understanding between the parties to the MS Tech and Dow contract that, ultimately, E3 was made" for "MS Tech." [Opinion, Docket No. 268, at 26].  Bayer's own witnesses confirmed that E3 was made for MS Tech.

This Court is troubled by the current evidence before it that, contrary to the arguments made before this Court and the Federal Circuit, there was a "dispute" as to whether E3 was made by or for MS Tech, Bayer told the arbitration tribunal in Bayer III, supra n.1, that "MS Tech has always owned the Enlist E3 event," and that this was "undisputed."  See Docket No. 318, Exhibit P, ¶ 178.  This Court spent considerable time addressing Bayer's arguments at the summary judgment stage wherein Bayer disputed the fact that E3 was made for MS Tech.  See Opinion at 24-28.  That Bayer later admitted that MS Tech always owned E3

20

A23

is disturbing evidence of its litigation misconduct.  See
Palcsesz v. Midland Mutual Life Insurance Co., 87 F. Supp. 2d
409, 415 (D.N.J. 2000)("It is difficult to get around the
conclusion that, in at least one of the fora, [plaintiff] was
not completely honest.")

Bayer goes on the offensive here.  According to Bayer,
under the 2004 license, MS Tech must own E3 events because
events containing *dmmg* must be by or for MS Tech.  Under the
1992 agreement (relevant to the Bayer III litigation), Dow must
own E3 in order not to breach the agreement.  Thus, Bayer,
contends Dow has been put in an irreconcilable ownership
problem.  That may or may not be, but Bayer's line of attack
detracts from the Court's task at hand.  The point here is what
was represented to this Court about the ownership of E3.  In
opposing summary judgment, Bayer claimed that the ownership of
E3 was a "fact question" that was "disputed" and "material" and
thus, prevented summary judgment.  The Court is troubled by the
fact that, even in the face of contrary evidence from its own
witnesses as to MS Tech's ownership of E3, Bayer opposed summary
judgment.  As much as Bayer wants to focus on what Dow
represented before the arbitration tribunal, the proper focus is
in what occurred before this Court.  The bottom line is:  Bayer
took an objectively unreasonable position that there was a

A24

dispute as to whether E3 was made for MS Tech.  The record was clear that it was, as the Court previously found.

Finally, Bayer attempts to defend its litigation conduct by relying on Dow's allegedly belated production of a 2011 amendment to its 2008 agreement with MS Tech, a defense Judge Schneider viewed as a mere straw man.  Essentially Bayer argues that Dow needed to prove that it had a license to commercialize the E3 product, but Bayer did not receive the 2011 amendment until after the lawsuit due to Dow's dilatory production.  Thus, Bayer argues, it was justified in prosecuting its case until it received the subsequent amendment.  Bayer goes so far as to bring this Court into the fray by contending that the Court relied on the 2011 amendment in finding a valid sublicense.  The Court did not.  Trying to understand how Bayer could make such statement, the Court foraged its own Opinion.  It found only a string citation to the 2011 amendment.  Op. at 7 (citing to Docket No. 127, Exhibits Q,R,S).  Bayer's argument that this Court somehow relied on the 2011 amendment when the entire Opinion explicitly focused on the 2008 agreement is patently disingenuous.  Bayer's attempt to place blame on Dow when there are no material distinctions between the 2008 contract and the 2011 amendment – as evidenced by the Court's express reliance on the 2008 contract – is simply inexcusable.

In sum, Bayer's conduct in litigating this case in the face
of evidence that contradicted its contorted reading of the
Agreement was objectively unreasonable.  The parties agreed that
English law governed the Agreement.  That means, both the
natural and ordinary meaning of the language <u>and the background
or surrounding circumstance</u> of the contract – the so-called
"factual matrix" – are considered.  Op. at 11.  Thus, given
Bayer's acknowledgment that English law governed, Bayer had an
obligation to inquire into the background or surrounding
circumstances of the Agreement.  It should have objectively
assessed what the Agreement conveyed to a "reasonable person
having all the background knowledge which would have reasonably
been available to the parties in the situation in which they
were at the time of the contract."  Op. at 12.  It did not.
Added to the fact that no witness supported Bayer's construction
of the Agreement, and that Bayer's construction made no
commercial sense, Bayer's (continued) interpretation was
objectively unreasonable.[10]

---

[10] Bayer's contention that its own expert testified that Bayer's
construction was correct is wrong.  It was clear to this Court
through the cross-examination of Lord Lawrence Collins that he
was unaware of the factual matrix ("The Court: Right.  So you've
- - you've given an opinion but I don't get the sense that, you
know, you're so confident in that opinion without really knowing
what the facts are because you made a lot of assumptions.  The
Witness:  I think that's the problem with an expert witness
giving a view on the facts . . . .") S.J. Hearing Tr. at 206.

Bayer defends itself by claiming that it was "unaware" that Dow had a license until Dow opposed Bayer's motion to amend the Bayer I Complaint. If that were the case, by Bayer's own admission, Bayer had a duty to investigate such license defense before filing another lawsuit. Had Bayer done any due diligence, it would have learned that no witness supported Bayer's construction of the Agreement and this case would should never have been filed. At a minimum, under Bayer's logic, it should have dismissed the Complaint when Dow produced the amendment on November 20, 2012, months within the filing of the Complaint. [See Docket No. 21, at Ex. 1].

Even by the time that Dow had filed its Motion to Dismiss, Bayer had not investigated Dow's licensing claim.[11] Bayer's language before Judge Andrews was unduly harsh:

> "When this business arrangement among Bayer and MS Tech and Stine is properly understood, all of DAS's arguments unravel."
>
> . . .
>
> "[Dow has a] gross misunderstanding of the licensing arrangement among Bayer, MS Tech and Stine . . . ."
>
> . . .
>
> "[R]ights incident to the commercial sale of soybeans incorporating Bayer's technology were not given directly to MS Tech. Those rights were given only to Stine but cannot be sublicensed."

---

[11] Bayer's reliance on Judge Andrews' denial of the Motion to Dismiss is wholly misplaced. No decision on the merits was reached by Judge Andrews.

Docket No. 11 at 3, 6 and 8.

However, Bayer's own News Release, dated November 26, 2007, announcing the business arrangement directly contradicted the claims Bayer asserted in this case.  The News Release announced a "long term collaboration agreement [with MS Tech] to jointly develop and _commercialize_ several innovative trait technology products in soybeans."  Docket No. 9-5 (emphasis added).  The News Release quoted Stine, as the Director of MS Tech,

> "We are excited by the potential benefits this collaboration with Bayer CropScience offers to growers and the industry", said Harry H. Stine, a Director of M.S. Technologies.  "As a result of this collaboration, soybean growers will have better solutions to optimize productivity and maximize per acre profits.  We are pleased to be working with Bayer, whose knowledge of herbicide technology and worldwide regulatory expertise will help us bring these novel products to market."

_Id._ (emphasis added).  Bayer takes the remarkable position that the News Release was not inconsistent with the position it took before Judge Andrews and this Court.  It is.  The News Release set forth that Bayer and MS Tech had agreed to commercialize the soybeans.  At a minimum, the 2007 News Release should have put Bayer on notice in this lawsuit that the commercialization venture was not with Stine only, as Bayer continued to argue, but with MS Tech (of which Stine was its director).  This fact should have prompted an inquiry into the contractual relationship vis-à-vis MS Tech.  Had Bayer made such inquiry, it

would have learned that the commercialization agreement had to be with MS Tech so that Stine did not incur liability to Monsanto. Contrary to what Bayer told Judge Andrews, it was Bayer, not Dow, that had a "gross misunderstanding" of the Bayer-MS Tech-Stine arrangement.

Throughout this litigation, Bayer marched onward with a view of its case that was not supported by its own witnesses. To be clear, if this were a case involving a colorable dispute regarding contract language, this would not be an exceptional case. But this case is not such case. Far from it. The positions Bayer took to support their contract interpretation arguments were directly contradicted by the record evidence Bayer had obtained through early discovery and Bayer should have made every effort to discover before filing suit. Bayer's filing of the motion for preliminary injunction early in this litigation was frivolous and unnecessarily increased the costs of litigation. First, Judge Andrews had already established filing and discovery deadlines. Second, and more importantly, Bayer claimed no further discovery was necessary to decide the motion. Such position is disturbing because at the very same time Bayer made this representation, the parties were conducting depositions. As set forth above and in this Court's prior Opinion, such

deposition testimony of Bayer's own witnesses debunked Bayer's claims.

It is disturbing to this Court that Bayer accuses (and continues to accuse) Dow of "soiled hands and litigation misconduct," [Docket No. 335, at 9] (Bayer's Opp. to Dow's Refiled Motion for Fees and Costs") when there is no evidence to support such accusation. Bayer labels Dow's request for fees as "[l]ong on rhetoric, but short on support." Id. Bayer is the classic pot calling the kettle black. Bayer claims that it litigated this case in good faith with conduct that was reasonably justified in law and fact. Yet, the facts simply do not bear this out as set forth above in the Court's prior Opinion and the Report and Recommendation.

Finally, Bayer seems to suggest that because the tribunal in Bayer III ruled that Dow breached Bayer's rights to the pat gene vis-à-vis its agreement with MS Tech for the creation of the E3 product — a fact Dow disputes — the sublicense at issue here involving the dmmg fails by res judicata. Although the tribunal's finding was subsequent to this Court's Opinion, Bayer argues that the Court must consider it. Bayer seems to be saying that because Dow has lost as to one of the genes in the E3 product, it ipso facto fails as to the other two genes, including the dmmg gene here because it is all one infringing product. Bayer's approach to this case appears to be: Dow has

eventually lost its ability to sell the E3 product so why should it get fees here?  Relatedly, Bayer proclaims: "[n]o fraud was committed; [n]o misrepresentation to the Court occurred, nor was evidence compromised."  [Bayer's Objections, at 2, n.3].  It is evident to this Court that Bayer fails to appreciate the harm caused by its objectively unreasonable litigation conduct.

In the final analysis, the Court finds Bayer's conduct troubling.  Faced with no evidence to support its tortured interpretation of the Agreement, Bayer has engaged in acrimonious fallacy and obfuscation, which resulted in unnecessary expenditure of legal fees by Dow.  Bayer will now have to pay the price.

2.  Objections to Amount of Award

Bayer additionally objects to any award of fees because Dow's billing records are so "heavily redacted" that it has been denied "due process" in opposing the fee request.  Bayer argued before Judge Schneider that the records were so heavily redacted, that they contained only vague references to activities, such as, "prepare" or "research", without any meaningful context.  [Docket No. 335, at 37].

The billing records run from August 2011 to June 2013. Judge Schneider deducted $95,702.49 from the total award because such fees were expended in connection with Bayer I.  Bayer does not appear to contest this deduction.  Judge Schneider reviewed

the underlined documentation finding such documentation was adequate.  Bayer, however, contends that it should be permitted to object to the reasonableness of the amount of the fees including the nature and extent of the work done by Dow's counsel, but that it cannot do so with the records being so heavily redacted.  As an example, Bayer cites to this Court (Bayer cited no example to Judge Schneider) a February 8, 2013, example where three timekeepers logged substantially the same amount of time for what appears to be the same task.  Bayer Obj. at 8.

     As a general principle, Bayer is entitled to appraise the reasonableness of the amount of fees requested by Dow including the nature and extent of the work done by Dow's counsel on various phases of the case, so that it may present to the court any legitimate challenges to Dow's claim. See Ideal Electronic Security Co., Inc. v. International Fidelity Insurance Co., 129 F.3d 143, 151 (D.C. Cir. 1997)("Ideal is entitled to discover the information it requires to appraise the reasonableness of the amount of fees requested by IFIC, including the nature and extent of the work done . . . so that it may present to the court any legitimate challenges to IFIC's claim."). See also Nationwide Payment Solutions, LLC v. Plunkett, 831 F. Supp. 2d 337, 338-39 (D. Me. 2011)("the extent that a fee-invoice claimant wishes a court to review an unredacted version of its

attorneys' billing invoices for the purpose of judging the reasonableness of its fee request, it must, as a matter of fundamental fairness, permit its opponent to review the unredacted version and be heard as to the reasonableness of the fee request with the benefit of that full and unfettered review"); Wasniewski v. Grzelak-Johannsen, 549 F. Supp. 2d 965, 975 (N.D. Ohio 2008)("The alternative of *in camera* review of an unredacted [attorney billing] statement is . . . unattractive because it interjects an element of *ex parte* review in this matter and deprives respondent of an opportunity to raise arguments"); Essex Builders Grp., Inc. v. Amerisure Ins. Co., No. 6:04-cv-1838-Orl-22JGG, 2007 U.S. Dist. LEXIS 14458, 2007 WL 700851, at *2 (M.D. Fla. Mar. 1, 2007)(denying fee claimant's motion to file documents under seal for *in camera* review; stating, "The Court finds that it would be manifestly unfair to Amerisure to require it to defend against the sizeable fee award claimed by Essex without the benefit of the full record upon which the fees are based.")

While this Court finds that Bayer could have done more before Judge Schneider in terms of articulating why it could not assess the reasonableness of Dow's fees, the Court will hold further oral argument on and reserve decision on this objection. (Alternatively, Dow may wish to turn over revised redacted

billing statements in the interim, which may obviate the need for oral argument).

Finally, Bayer objects to the award on the grounds that the Report and Recommendation failed to conduct an independent analysis as to the reasonableness of the hourly rates. Bayer, however, never challenged the appropriateness and reasonableness of the rates for Dow's counsel before Judge Schneider. This Court will not permit Bayer to raise it here. Bayer's argument that its failure to challenge the rates is connected to the redacted billing statements is disingenuous. One has nothing to do with the other.[12]

III. Conclusion

For the reasons set forth above, the Court adopts the Report and Recommendation granting Dow's Motion for Fees and

---

[12] Even putting Bayer's failure to challenge Dow's rates, this Court finds the fees are reasonable. Dow negotiated a billing arrangement whereby counsel for Dow charges less than its standard hourly rates charged to other clients for work done by attorneys, paralegals, and other timekeepers; limits timekeepers to those with valuable and relevant experience; and provides additional discounts. The average partner billing rates for the periods July 2012-December 2012 and January 2013-April 2014 fell between $743.50-$778.75. See D.I. 323 (Bicks Decl.) at Table 7. Delaware courts have approved rates between $650 and $700, putting counsel's rates within roughly 10% of the rates approved for Delaware attorneys with similar experience. See, e.g., Glass Co. v. Guardian Indus. Corp., No. CIV. 09-515-SLR, 2013 WL 936451, at *3 (D. Del. Mar. 11, 2013)($690 rates for outside patent counsel); In re ALHHoldings LLC, No. CIV. 04-1339-SLR, 2010 WL 520632, at *3-4 (D. Del. Feb. 12, 2010) ($675 rates reasonable); Segen v. OptionsXpress Holdings, Inc., 631 F.Supp.2d 465, 476 (D. Del. 2009)(rates of $700 and $650 reasonable).

31

A34

Costs as Prevailing Party.  The Court reserves on the amount of
the award.


                                    s/Renée Marie Bumb
                                    RENÉE MARIE BUMB
                                    United States District Judge

Dated: March 13, 2015

32

A35

## <u>PROOF OF SERVICE</u>

I hereby certify that on November 20, 2015, I electronically filed the foregoing Opening Brief of Plaintiffs-Appellants with the Clerk of the United States Court of Appeals for the Federal Circuit using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.  I further certify that the foregoing was served via electronic mail upon the following:

Mark Davies
Susannah Landes Weaver
ORRICK, HERRINGTON & SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC 20005
(202) 339-8400
mark.davies@orrick.com
sweaver@orrick.com

Andrew Silverman
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 W. 52nd Street
New York, NY 10019
(212) 506-5000
asilverman@orrick.com

*Counsel for Defendant-Appellee*

/s/ Adam K. Mortara
Adam K. Mortara
BARTLIT BECK HERMAN
  PALENCHAR & SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
Tel: (312) 494-4400
Fax: (312) 494-4440
adam.mortara@bartlit-beck.com

*Counsel for Plaintiffs-Appellants*
*Bayer CropScience AG and Bayer S.A.S.*

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 12,155 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word version 2013 in 14-point, Garamond font.

November 20, 2015

*/s/  Adam K. Mortara*
Adam K. Mortara
BARTLIT BECK HERMAN
  PALENCHAR & SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
Tel: (312) 494-4400
Fax: (312) 494-4440
adam.mortara@bartlit-beck.com

*Counsel for Plaintiffs-Appellants*
*Bayer CropScience AG and Bayer S.A.S.*